Joseph F. SCOTT, Plaintiff,

v.

AMERICAN NATIONAL FIRE
INSURANCE COMPANY,
INC., Defendant.

CASE NO. 5:02–CV–0516.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 19, 2002.

James T. Robertson, William S. Pidcock, Robertson, Zeglen & Pidcock Sre. C, Canton, OH, for Plaintiff.

Brian D. Sullivan, Reminger & Reminger, Cleveland, OH, for Defendant.

OPINION

GWIN, District Judge.

In this case, Plaintiff Joseph Scott ("Scott") seeks a declaratory judgment establishing the limit of his coverage under a professional liability insurance policy. Defendant American National Fire Insurance Company, Inc. ("American National") issued the policy to Scott. Scott made claim under that policy after being sued for malpractice arising from his work for investors and the corporation they formed.

In seeking an interpretation of the policy, Scott contends the Court should find the limits of coverage are the multiple claim limits, not the single claim limits. Responding, American National asserts that the limits of coverage should be found to be the single claim limit because the claims underlying this suit were "related" and thus subject to the single claim limit. For the reasons that follow, the Court finds, and declares, that the claims against Scott are subject to the aggregate insurance policy limits, not the single claim limit.

I.  Background

In deciding this issue, the Court determines whether the malpractice claims asserted against Plaintiff Scott are separate claims subject to American National's aggregate insurance policy limits, or are "related" claims subject to a single claim limit.

Scott is an attorney. The malpractice claims that underlay this case arose out of Scott's activities in the creation of a corporation formed to manufacture and market

golf equipment and apparel. The business venture failed.

After the golf equipment company failed, certain investors and the company sued Scott. In their malpractice action against Scott, they claimed he failed to protect their separate interests, resulting in damage to them. In consideration of certain payments made on Scott's behalf, the malpractice claims were settled. In that settlement, those parties agreed to submit the issue of the limits of coverage to this Court.[1]

This case turns on the construction of the term "related" in American National's professional liability insurance policy. In construing the term, the Court examines both the policy language at issue and the alleged acts giving rise to the underlying malpractice claims. The Court now turns to an examination of these areas.

### A. Formation of RIPIT Golf & Sports Equipment, Inc.

The underlying malpractice claims against Scott came out of Scott's activities in the creation of a corporation formed to manufacture and market golf equipment and apparel. William Ackerman ("Ackerman") owned intellectual property rights related to the design and marketing of golf equipment, including the RIPIT 1357 golf club. Brian F. Stimer ("Stimer") and Dr. Keith Ungar ("Ungar") are individuals who ultimately invested in a company, RIPIT Golf & Sports Equipment, Inc. ("RIPIT"), set up to produce and market golf equipment designed by Ackerman. In 1998, Scott agreed to represent Stimer, Ungar, and Ackerman in the creation of a business venture, RIPIT, to manufacture and sell golf equipment, including the RIP-IT 1357 club. Scott also acted as RIPIT's corporate counsel.

After negotiations, Stimer and Ungar each agreed to make capital contributions to RIPIT in exchange for respective 31% interests in RIPIT. In consideration for a 31% interest in RIPIT, Ackerman agreed to assign all of his intellectual property rights associated with the RIPIT name, including patent and trademark rights to the RIPIT 1357 club. Finally, Scott agreed to exchange legal services for a 7% interest in RIPIT.

### B. Scott's Duties to Stimer, Ungar, & RIPIT

In his capacity as an attorney, Scott represented three separate clients in the RIPIT transactions. First, Scott represented investor Stimer. Second, Scott represented investor Ungar. Finally, Scott represented the RIPIT Golf & Sports Equipment, Inc. As to each client, Scott owed different duties and responsibilities. As to the RIPIT corporation, Scott had responsibility to insure that proper incorporation took place. As part of this, Scott needed to insure that RIPIT received capital and other contributions consistent with pre-incorporation agreements. Importantly, Scott had the duty to insure that the intellectual property rights that Ackerman promised to contribute were, in fact, received. Without obtaining the rights to Ackerman's intellectual property, there was scant reason for RIPIT. Equally important to the RIPIT corporation, Scott had responsibility to insure that the intellectual property being received from Ackerman had value. Central to this, it was crucial for Scott to insure that the United States Golf Association

---

1. With the parties' consent, this Court ordered that the case be resolved on the briefs and stipulated facts. (Doc. 16.) Although Defendant American National filed a motion for summary judgment on July 15, 2002, this case is not being resolved on a summary judgment motion. Defendant's motion is more appropriately characterized as a trial brief.

("USGA") approved the RIPIT 1357 club for competition. Without such approval, the RIPIT 1357 had little marketable value.

Scott owed different duties to Stimer and Ungar. As to these individual investors, Scott most importantly needed to insure they would be protected from personal liability for RIPIT's obligations. And unless these individual investors had protection for their personal assets, Scott needed to advise them if RIPIT was structuring its dealings with outside vendors in ways that exposed these investors to personal liability.

C. Scott's Breaches and RIPIT's Failure

RIPIT failed. Moreover, Scott failed to perform his duties to Stimer, Ungar, and RIPIT. First, he breached his duty to Stimer and Ungar by failing to properly and timely incorporate RIPIT. As a result, Stimer and Ungar incurred personal civil liability to RIPIT's vendors for the corporation's debts.[2] Scott also failed to tell Stimer and Ungar that they were personally exposed. Believing they had limited liability, they supported RIPIT transactions that exposed them to personal liability to creditors for RIPIT's pre-incorporation activities.

Scott also breached his duties to RIPIT. He did not ensure that Ackerman transferred his intellectual property rights in the golf equipment to RIPIT. Consequently, RIPIT could not carry out the purpose for its formation, to manufacture and sell golf equipment. RIPIT also was unable to enforce a trademark infringement suit because its rights to the intellectual property rights underlying the suit could be disputed.[3] Finally, Scott failed to exercise due diligence and determine that the USGA had approved the RIPIT 1357 club for use. In fact, it had not approved the club, making the club significantly less marketable. As a result, Ackerman's intellectual property rights had little value to RIPIT.

Based on these failures, Stimer, Ungar, and RIPIT filed malpractice actions against Scott in 2000. The actions detailed how Scott breached different duties to each complainant through several different transactions with each breach resulting in different harms.

The parties, with American National's participation and consent, settled the case. As part of the settlement agreement, Scott would file a declaratory judgment action to determine whether American National's per claim limit or aggregate claim limit of professional liability applied to the malpractice actions.[4] The Court now describes the policy interpretation issues at the core of the parties' dispute.

D. American National Professional Liability Insurance Policy

American National provided Scott with professional liability coverage under policy number TPL2670206, effective June 1, 1999 through June 1, 2000. (Doc. 32.)

---

2. In 1999, Newport Golf Corporation, the vendor supplying RIPIT's club heads, grips, and head covers, sued RIPIT, Stimer, and Ungar, to recover on past due invoices. The case has been stayed because RIPIT has filed for bankruptcy.

3. In March 1999, RIPIT and Ackerman sued Rawlings Sporting Goods for alleged trademark infringement. Due to RIPIT's disputed intellectual property rights, RIPIT settled the case for a nominal sum.

4. Under the settlement, if American National demonstrates that the allegations against Scott are subject to the per claim limit, American National would pay no money to indemnify Scott. But if Scott obtains a declaration that the allegations are subject to the aggregate limit, American National will pay an additional $225,000 to the RIPIT plaintiffs.

The policy is a claims-made policy with a $200,000 liability per claim limit and a $600,000 aggregate limit for multiple claims. (Doc. 32.) The policy defines a claim as "a demand received by any insured for money or services, including the service of suit or institution of arbitration proceedings against the insured, or disciplinary proceedings." (Doc. 32 Ex. A.) The policy was in full force and effect with Scott as its insured at all times pertinent to this dispute. Scott gave notice of RIP-IT, Ungar, and Stimer's claims against him, complying with the policy's notice requirements.

This case pivots on whether Scott's malpractice acts constitute a single claim subject to the $200,000 limit or separate claims subject to the $600,000 aggregate limit. The policy language at issue regarding treatment of multiple claims as single claims is as follows:

> The inclusion herein of more than one insured or the making of claims by more than one person or organization shall not operate to increase the Company's Limits of Liability. *Claims alleging, based upon, arising out of or attributable to the same or related acts, errors, or omissions shall be treated as a single claim regardless of whether made against one or more than one insured.* All such claims, whenever made, shall be considered first made during the policy period or any extended reporting period in which the earliest claim arising out of such acts, errors or omissions was first made and all such claims shall be subject to the same limits of liability.

(Doc. 32 Ex. A.) (emphasis added).

## II. Analysis

### A. Standard

The sole issue to resolve is the interpretation of the term "related" in the professional liability insurance policy. The parties have submitted the issue to the Court for resolution on the briefs and stipulated facts.

Construction of an insurance contract is a matter of law. *See United National Ins. Co. v. SST Fitness Corp.,* 182 F.3d 447, 449 (6th Cir.1999). When interpreting an insurance policy, "words and phrases used in an insurance policy must be given their natural and commonly accepted meaning." *United States Fid. & Guar. Co. v. Lightning Rod Mut. Ins. Co.,* 80 Ohio St.3d 584, 687 N.E.2d 717, 719 (Ohio 1997); *see also Watkins v. Brown,* 97 Ohio App.3d 160, 646 N.E.2d 485, 487 (Ohio Ct.App.1994)("Contract terms are to be given their 'natural and usual' meaning if they are not defined in the policy, unless it is clear from the policy that the parties intended to use some specialized or technical definition.").

Further, "courts are required to interpret the contract in such a way as to give effect to the intention of the parties at the time the agreement was entered into, as evidenced by the provisions of the contract.... When a contract term is defined in the policy, that definition controls what the term means." *Watkins,* 646 N.E.2d at 487.

### B. Analysis

As previously mentioned, this case turns on the construction of the term "related" in the policy provision. American National says the claims are related. Scott says they are not.

■ Courts must construe ambiguous terms in an insurance policy in favor of the insured and against the insurer. *See, e.g., Blohm v. Cincinnati Ins. Co.,* 39 Ohio St.3d 63, 65, 529 N.E.2d 433 (1988). But, this rule of construction in favor of the insured does not apply where the policy language is "unambiguous or where ambiguity can be resolved through ordinary rules of interpretation". *See* 57 Ohio

694

Jur.3d § 287 (1977). Further, when the "provisions of an insurance policy are clear and unambiguous courts may not indulge themselves in enlarging the contract by implication in order to embrace an object distinct from that contemplated by the parties." *Gomolka v. State Auto. Mut. Ins. Co.*, 70 Ohio St.2d 166, 168, 436 N.E.2d 1347 (1982).

■ The parties do not point to any Sixth Circuit authority directly interpreting the term "related" in a professional liability insurance policy provision. Other courts addressing the issue, however, have taken differing approaches. Some courts use the commonly accepted meaning of "related." *See Continental Cas. Co.*, 205 F.3d at 1262–63; *Gregory v. Home Ins. Co.*, 876 F.2d 602, 606 (7th Cir.1989). Among these courts, there is variation in how broadly "related" is defined. Some courts define "related" as meaning either a logical or causal connection between events. *See Gregory*, 876 F.2d at 606 (holding that "the common understanding of the word 'related' covers a very broad range of connections, both causal and logical"); *Continental Cas. Co.*, 205 F.3d at 1262–63 (holding that relate means a logical or causal connection between events).

Other courts look to a causal connection between two events, *see St. Paul Fire & Marine Ins. Co.*, 787 F.Supp. 183, 188 (D.Kan.1992) (finding that related "should be defined solely in terms of causation"), or a logical connection that is not attenuated, *see Nat'l Union Ins. Co. of Pittsburgh, Pa. v. Holmes & Graven*, 23 F.Supp.2d 1057, 1070 (D.Minn.1998) (defining related as encompassing logical connections but as excluding attenuated logical connections).

In addition to looking at the dictionary meaning to determine if multiple malpractice claims are related, some courts also focus on the distinctness of the attorney's duty to the clients, *see St. Paul Fire & Marine Ins. Co.*, 787 F.Supp. at 188; *Con-*

*tinental Cas. Co. v. Grossmann*, 271 Ill. App.3d 206, 207 Ill.Dec. 719, 648 N.E.2d 175 (1995), or on the commonality of the losses, *see Nat'l Union Ins. Co. of Pittsburgh, Pa.*, 23 F.Supp.2d at 1070 (holding that malpractice claims were unrelated where the losses generated by the attorney's mistakes were different and not co-terminous). Under this approach, if the attorney's duties are distinct and separate, or the actions result in distinct harms, then the actions in breaching those duties give rise to separate malpractice claims.

In *St. Paul Fire & Marine Ins. Co.*, the Court found that three malpractice claims arising from an attorney's multiple representation of three clients in a criminal trial were unrelated. *See* 787 F.Supp. at 188. The attorney had defended all three clients against a kidnaping charge. *See id.* at 186–87. The Court reasoned that while the criminal charges arose out of the same set of events and the malpractice claims all involved the attorney's conduct during the criminal trial, the claims were not related because the attorney owed each client a separate duty. *See id.* at 188. The *St. Paul Fire & Marine Ins. Co.* Court used the narrower causal connection definition of related but noted that it would reach the same result under the logical connection definition because "[a]lthough the errors and omissions [the attorney] committed grew out of highly similar factual situations, [the attorney] had a separate duty to each client and was rendering separate services to each." *Id.* Therefore, the Court found that the attorney committed multiple acts and omissions that "resulted in discrete losses to each of the defendants." *Id.*

The *Continental Cas. Co. v. Grossmann*, Court applied similar duty reasoning and held that malpractice claims against an attorney by three clients were not related though all of the claims involved invest-

ments in or by the Springdale Corporation. *See Continental Cas. Co. v. Grossmann,* 271 Ill.App.3d 206, 207 Ill.Dec. 719, 648 N.E.2d 175, 179 (1995). Specifically, the Court noted that the attorney breached distinct duties to both individual stock investors and the corporation. *See id.* Because the attorney owed distinct duties, the claims were unrelated. *See id.*

In the absence of binding authority, the Court reasons that the present case is more analogous to those cases that apply the separate duty and distinct harm approach. Using that approach, Scott's malpractice actions are unrelated because Scott owed separate and distinct duties to Stimer, Ungar, and RIPIT. Further, the investors' rights are separate from RIPIT's rights. For example, Stimer and Ungar had a separate right to be protected from exposure to personal liability for RIPIT's obligations. Scott had a corresponding duty to properly incorporate RIPIT to shield Stimer and Ungar from corporate liability. This duty is separate and unrelated to Scott's duty to RIPIT to properly transfer Ackerman's intellectual property rights. Scott also had a duty to RIPIT to learn the status of the USGA's approval of the RIPIT 1357 club to ensure that Ackerman's patent and trademark rights had value. This duty is different in kind from the duty Scott owed Unger and Stimer. RIPIT had a corresponding right to have Scott ensure that Ackerman's intellectual property rights had value.

Further, Scott's breaches of his separate duties resulted in different and discrete harms. Because of Scott's breach of duty to RIPIT, the corporation is the disputed owner of 11,000 golf clubs that the USGA refuses to approve and for which RIPIT does not clearly own the intellectual property rights to. The clubs are worthless. Stimer and Ungar fare little better. They are left with a worthless investment and exposure to civil liability for RIPIT's obli-

gations. Each of these discrete damages results from Scott's breach of distinct and separate duties to the individual investors and the corporation.

In sum, the investors' rights are separate from RIPIT's rights. Scott's duties to Stimer and Ungar are separate from his duties to RIPIT. Consequently, Scott's acts in breach of his duties to Stimer and Ungar are separate and unrelated from his actions that breached his duties to the corporation. Accordingly, the malpractice claims against Scott are separate claims and are subject to the aggregate limits of policy coverage.

### III. Conclusion

For the reasons discussed above, the Court grants judgment to Plaintiff Scott upon the briefs and stipulated facts. The court finds and declares that the claims against Scott are subject to the aggregate insurance policy limits, not the single claim limit.

IT IS SO ORDERED.