843 A.2d 78

Eric BEALE, a minor, etc., et al.

v.

AMERICAN NATIONAL LAWYERS INSURANCE
RECIPROCAL (Risk Retention Group).

No. 87, Sept. Term, 2002.

Court of Appeals of Maryland.

Feb. 19, 2004.

Saul E. Kerpelman (Saul E. Kerpelman & Associates, P.A., on brief), Baltimore, for appellants.

J. Jonathan Schraub (Danny M. Howell, Schraub & Co., Chtd., on brief), McLean, VA, for appellee.

Argued before BELL, C.J., ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, C.J.

 This appeal from an order entering declaratory judgment presents the question whether, as a matter of law, in a legal malpractice action, the claims of each of five children allegedly injured as a result of the negligence of the same defendants, when consolidated for trial and, therefore, where all five of the claims are totally neglected, constitute a single claim under an insurance policy limiting the malpractice carrier's liability for damages to those "arising out of the same, related or continuing Professional Services without regard to

---

* Eldridge, J. now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

the number of claims made, demands, suits proceedings, claimants, or Persons Insured involved." [1] The Circuit Court for Baltimore City concluded that they do. We shall reverse.

Between 1988 and 1990, Eric, Michael, Antoine, Dustin and Cynthia Beale (the Beale Children), the appellants, resided at premises, 1705 Holbrook Street in Baltimore City, in which, it was alleged, there was loose and flaking paint and which was cited for lead paint violations. During that time, and as a result of the alleged negligence of the landlord, each child was exposed to, and ingested, lead paint, sustaining an elevated blood lead level, as a result. The Beale Children's grandmother retained Mark E. Herman, Esq. and the firm with which he was associated, William G. Kolodner, P.A. (hereinafter, collectively, Kolodner, P.A.), to represent them in their attempt to recover for their injuries.

Kolodner, P.A. filed suit against Northern Brokerage Co. and Brokerage I., Inc., the owners and operators of 1705 Holbrook, the landlords, on behalf of the Beale children and their parents. The complaint, consisting of eighteen (18) counts, alleged in separate counts applicable to the Beale children, their mother and their father, negligence, breach of warranty, negligent misrepresentation, nuisance, unfair and deceptive trade practices and breach of contract. Thus, there were six counts relating to the Beale children, the claim of

---

1. American National Lawyers Insurance Reciprocal (Risk Retention Group), the appellee, is in receivership and has moved this Court to stay further proceedings in this case until its Receiver, which is located in Tennessee, can evaluate all the claims against the appellee in numerous states. The Receiver maintains that a stay of this action in this court is essential "to protect the interest of insureds, claimants, creditors, and the public generally and provide for the equitable apportionment of any avoidable loss." We do not agree. Whether we reverse or affirm the Circuit Court's ruling, the outcome is unlikely to complicate the Receiver's evaluation process, nor is the outcome likely to be essential to the determination of the appellee's liability to other entities. At issue here, is whether the appropriate claim limit is "Per Claim," not to exceed $1,000,000.00, or "Aggregate," not to exceed $2,000,000.00. This difference in the limit of liability is merely an arithmetic computation; it is difficult to see why a stay is essential to the protection of pertinent interests and the Receiver's letter has not clarified the point. We deny the request for a stay of proceedings.

each Beale child being consolidated with the claims of all of the other Beale children. The claims of each individual child, as alleged was identical to the claims of all of the other children. Subsequently, noting the lack of any evidence as to the landlord's notice of the lead paint condition in the leased premises and on the issue of the causal connection between the alleged presence of lead-based paint in the dwelling and the alleged injury to the children, the trial court granted the landlords' motion for summary judgment and entered judgment in their favor.[2] That judgment was affirmed by the Court of Special Appeals in an unreported opinion.

Subsequently, now represented by new counsel, the Beale children, by their grandmother and next friend, brought a malpractice action against Kolodner P.A. Although consolidated in one complaint, having a total of ten (10) counts, the claim of each of the children against the law firm and Herman was set forth in separate counts. In each count, the subject child alleged that, as a result of the total neglect of his or her attorney, as appropriate, Kolodner, P.A. and Herman, he or she was injured. More specifically, each count alleged that Kolodner, P.A. was negligent in:

"a. Failing to properly investigate, prepare, handle, prosecute, pursue and litigate the claims of the Plaintiff;

"b. Failing to adequately research the law as to lead paint poisoning actions;

"c. Agreeing to handle a legal matter which they knew or should have known they were not competent to handle;

---

**2.** When filed, the action was placed on the Circuit Court's "lead paint track." That track is designed to streamline the handling of lead paint cases by imposing certain deadlines, for example, for completion of discovery, to have the child or children psychometrically tested to determine the extent of the brain damage, to supply a report from the testing neuropsychologist to the landlord, to answer interrogatories, to name expected experts and summarize their testimony.

It is alleged that Kolodner, P.A. never had the children tested, named experts or moved to modify the scheduling order. In addition, it did not oppose the landlords' motion for summary judgment.

"d. Failing to properly retain, hire and name expert witnesses, and to provide the opinions and reports of these expert witnesses pursuant to a Circuit Court Scheduling Order;

"e. Failing to properly respond to motions for summary judgment filed by the landlord;

"f. Failing to have Plaintiff evaluated psychometrically for the presence of brain damage resulting from his lead poisoning prior to recommending the said grossly inadequate settlement;

"g. Failing to conduct even the most rudimentary research in the medical literature to determine future consequences of the level of lead poisoning sustained by the Plaintiff."

Kolodner P.A. was insured, under a lawyers professional liability policy, by American National Lawyers Insurance Reciprocal (Risk Retention Group) (ANLIR), the appellee. That policy provided coverage of $ 1,000,000 per claim and $ 2,000,-000 aggregate per policy period and that ANLIR would pay on behalf of its insured "all sums [the insured] shall become legally obligated to pay as Damages because of any [timely made] Claim to which this policy applies." With respect to the policy limits, it provided:

"The Per claim Limit of Liability stated in the Declarations Page is the limit of the Company's liability for all Damages arising out of the same, related or continuing Professional Services without regard to the number of claims made, demands, suits proceedings, claimants, or Persons Insured involved. If additional Claims are subsequently made and reported to the company and arise out of the same, related or continuing [3] Professional Services as a claim already made and reported to the Company, all such claims, whenever made, shall be considered first made and reported within the Policy Period or Extended Reporting Period in which the earliest claim arising out of such Professional

---

3. No argument has ever been made, and none is presented in this Court, that the claims of the Beale children arise out of "continuing" professional services.

Services was first made and reported. All such Claims shall be subject to the Per Claim Limit of Liability applicable at the time the first Claim or act, error or omission was first reported to the Company.

"The Aggregate Limit stated in the Declarations Page is the limit of the Company's liability for all Damages arising out of Claims first made and reported to the Company during each Policy Period, or in the case of an Extended Reporting Period, the entire applicable Extended Reporting Period. The Aggregate Limit of Liability does not increase the Per Claim Limit of Liability for Claims arising out of the same, related or continuing Professional Services."

"Professional Services" were defined as

"Legal services which the Insured renders or fails to render, in his or her capacity as a lawyer, for or on behalf of one or more clients, arising from or within an attorney-client relationship."

A "claim," the policy states, is "a demand received by the insured for money, other than fines, penal sums or any other amount or item not otherwise included within the definition of Damage in this policy, including the service of suit or the institution of other proceedings against the insured."

Maintaining that, under its policy, the five Beale claims constituted but "one claim," ANLIR offered the appellants its per claim limit of $ 1,000,000.00. When the appellants rejected the offer, it filed this declaratory judgment action to resolve which limit of liability applied, the per claim or the aggregate. The legal malpractice action was stayed pending the result of the declaratory judgment action.

█ The Circuit Court entered summary judgment in favor of ANLIR.[4] Agreeing with ANLIR that the claims of each

---

**4.** While it is permissible for trial courts to resolve matters of law by summary judgment in declaratory judgment actions, the trial court must still declare the rights of the parties. *Megonnell v. United Services Ass'n.,* 368 Md. 633, 642, 796 A.2d 758, 763 (2002). The trial court made such a declaration in this case. The only issue we must decide, therefore, as is the case in every summary judgment case, is whether

one of the Beale Children and, therefore, the damages each claimed due to their attorneys' alleged malpractice, "arose out of the 'same, related or continuing Professional Services, without regard to the number of Claims made, demands, suits, proceedings, claimants or Persons Insured involved,' " it declared, "[b]ased upon the undisputed material facts, and in accordance with caselaw cited by the parties, the Per Claim Limit of Liability of the Policy applies to all damages claimed by the Beales' claims against the Attorneys."

The Petitioner timely noted an appeal to the Court of Special Appeals. We granted certiorari, on the Court's own motion, before any proceedings in the intermediate appellate court. *Beale v. Am. Nat'l*, 371 Md. 613, 810 A.2d 961 (2002). We shall reverse the judgment of the Circuit Court for Baltimore City.

I.

In granting summary judgment, the trial court, noting that "[t]he alleged negligence [is] identical in all ten counts of the [malpractice] Complaint," and that the Beale children alleged their attorneys, "had[, and breached,] the same, identical duties as to the Beales," concluded that "the damages claimed by the Beales due to the Attorneys' alleged malpractice arose out of the 'same, related or continuing Professional Services, without regard to the number of Claims made, demands, suits, proceedings, claimants or Persons Insured involved.' " It accordingly held that the per claim limit of liability applied to all damages claimed by the Beale children in the malpractice action. The court characterized as hypothetical and missing the point, the appellants' argument that the aggregate limit applied because the attorneys need not have been negligent as to all of their clients; they could have been negligent as to one or more, but not all. More relevant to the court was

the trial court was legally correct, a determination we make after reviewing the trial court's ruling de novo. *Heat & Power v. Air Products*, 320 Md. 584, 591–92, 578 A.2d 1202, 1206 (1990).

"The Beales have not identified any professional service which the attorneys should have performed as to one or more of the Beales[, b]ut which they were not required to perform as to the others. In other words, the Beales have failed to show how the Attorneys' duty to render professional service to them differed in any [respect] whatsoever."

The Circuit Court relied on cases from our sister states, there being neither Maryland nor Tennessee [5] cases on

---

**5.** The appellee, a Tennessee corporation, has argued that Tennessee law should be applied in the resolution of the instant dispute. It submits that, under Maryland choice of law principles, the insurance policy, and its interpretation, are governed by Tennessee Law. (Appellee's brief, at 14). It relies on a provision of the policy which provides that the "[policy] is effective upon attachment of the Declarations signed by an authorized representative of the Company." (Appellee's brief, at 13). Generally in Maryland, if an insurance policy contains such a clause, the appropriate law is the state where the authorized representative signs the document, because this signature is the "last act performed which renders the contract binding." *Ohio Cas. Ins. Co. v. Ross,* 222 F.Supp. 292, 295 (D.Md.1963); *see also Kramer v. Bally's Park Place,* 311 Md. 387, 390–391, 535 A.2d 466, 467 (1988); *Kronovet v. Lipchin,* 288 Md. 30, 43, 415 A.2d 1096, 1104 (1980) (holding that generally parties to a contract may agree as to law which will govern their transaction, even as to issues going to the validity of the contract). In this case, however, the appellee did not give timely notice of its intention to rely on foreign law, as required by Md.Code (1974, 2002 Replacement Volume) § 10–504 of the Courts & Judicial Proceedings Article. That section provides:

> "A party may also present to the trial court any admissible evidence of foreign laws, but, to enable a party to offer evidence of the law in another jurisdiction or to ask that judicial notice be taken of it, reasonable notice shall be given to the adverse parties either in the pleadings or by other written notice."

Our courts have interpreted that section to mean that, if a party wishes to rely on a foreign law, notice should be given in the trial court so that the adverse party has an adequate opportunity to prepare his arguments on the foreign law. *Frericks v. General Motors Corp.,* 274 Md. 288, 296, 336 A.2d 118, 123 (1975); *Dialist Co. v. Pulford,* 42 Md.App. 173, 399 A.2d 1374 (1979) (holding when neither party gives notice of an intention to rely on foreign law, our courts will apply Maryland Law).

Here, the appellee is, in effect, asking us to take judicial notice of Tennessee law in spite of its failure to comply with § 10–504. Although we may, in our discretion take judicial notice of foreign law where the statutory notification was not given and proof of the foreign law was not presented, *Chambco v. Urban Masonry Corp.,* 338 Md. 417, 421, 659

point. *Atlantic Permanent Federal Savings and Loan Association v. American Casualty Co. of Reading, Pa.*, 839 F.2d 212 (4th Cir.1988); *Gregory v. Home Ins. Co.*, 876 F.2d 602 (7th Cir.1989); *Chemstar, Inc. v. Liberty Mutual Ins. Co.*, 41 F.3d 429 (9th Cir.1994); *Mead Reinsurance v. Granite State Insurance Co.*, 873 F.2d 1185 (9th Cir.1988); *Continental Cas. Co. v. Wendt*, 205 F.3d 1258 (11th Cir.2000) (adopting opinion in *Continental Cas. Co. v. Hall*, 1999 U.S. Dist. LEXIS 21258; *Continental Cas. Co. v. Brooks*, 698 So.2d 763 (Ala.1997); *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993).

*Gregory, Wendt, Bay Cities* and *Brooks* all involved legal malpractice actions. In *Gregory*, the attorney for the broker of a videotape series, in addition to providing services in connection with the videotape investment program, drafted the production service agreement and promissory note to be signed by the videotape purchasers and a tax and security opinion letter concerning the videotape sales. The tax and security opinion letter was reprinted in a sales brochure distributed to prospective buyers, in which investors were advised that the videotapes were not securities and that their purchase would have certain tax advantages. 876 F.2d at 602–603. When the Internal Revenue Service disallowed the deductions the attorney advised would be allowed, a class action lawsuit was filed, in which, *inter alia*, the attorney was joined via cross-claim for malpractice. *Id.* at 603. The case was

A.2d 297, 299 (1995); *Harry L. Sheinman & Sons v. Scranton Life Ins. Co.*, 125 F.2d 442, 444 (3d Cir.1942); *M.N. Axinn Co. v. Gibraltar Development*, 45 N.J.Super. 523, 133 A.2d 341, 347 (1957); *Litsinger Sign Co. v. American Sign Co.* 11 Ohio St.2d 1, 227 N.E.2d 609, 613–614 (1967), as we did in *Frericks*, supra, we decline to do so here because the case proceeded in the trial court on the assumption that Maryland Law was applicable, and we granted *certiorari* on that basis. *Frericks*, 274 Md. at 296, 336 A.2d at 123.

Furthermore, the appellee concedes that "[i]t is immaterial whether the issue in the this case is governed by Tennessee or Maryland Law," and that "neither party has suggested that the outcome would be different under the laws of the two states, and the analogous cases construing the relatedness concept." (Memorandum in Support of Defendants Motion for Summary Judgment, at 2, fn. 2). Thus, we apply Maryland law.

settled when the court to which the action was assigned held, also contrary to the attorney's advise, that the videotape sales were "investment contracts" and did not qualify for a private offering exemption. *Id.* The settlement contemplated that a declaratory judgment action would be brought to determine whether, under the attorney's professional liability policy, the "per claim" limit of liability or the "aggregate" limit applied to the class claims. Under that policy, "[t]wo or more claims arising out of a single act, error, omission or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim." *Id.* at 604.

The court held that the claims flowing from both the attorney's alleged error in the opinion letter with respect to the tax consequences of buying videotapes pursuant to the videotape offering and his error concerning the videotape promotion as a security were sufficiently related to be considered a single claim under the insurance policy. *Id.* at 605–606. This was so, the court reasoned, because "the acts giving rise to the claims could be considered causally connected, since they were performed by a single individual . . . and involved legal advice and drafting of three documents all of which 'flowed from his structuring the deal to try to achieve certain tax and security consequences.' " *Id.* at 605.

The limits of a lawyer's Professional Liability Insurance Policy were also at issue in *Wendt.* That policy defined "the limit of liability stated for 'each claim' " as "the maximum we will pay for all claims and claim expenses arising out of, or in connection with, the same or related wrongful acts." *Id.* at 1260. The precise issue was whether the acts of an attorney forming the basis for a suit against him for making false and misleading statements were related, or logically connected, to those forming the basis for a later third party complaint asserting similar misrepresentations against him. *Id.* at 1263.

As in *Gregory,* the attorney in *Wendt,* in addition to performing legal services regarding various aspects of the transactions, promoted the sales of notes issued by his client. 205 F.3d at 1259. The activities in that regard, it was alleged,

consisted of appearing at seminars and holding himself out as knowledgeable in securities law; representing at these seminars the legality of his client's loans; vouching for the legality of the loans with clients to whom he had a fiduciary duty; and "taking loans of money from his employees, drafting brochures for use by promoters, and various other illegal and unethical activities all performed with the aim of supporting investment in [his client's] loans." *Id.* at 1263. Holding that "[t]he plain meaning of the word 'relate' is to 'show or establish a logical or causal connection between,'" the court concluded that the suits did "relate or have a 'logical connection' in any 'meaningful sense of the word.'" *Id.* It explained:

"It is clear that Hall's course of conduct encouraged investment in [the client's] notes. Though clearly this course of conduct involved different types of acts, these acts were tied together because all were aimed at a single particular goal. The fact that these acts resulted in a number of different harms to different persons, who have different types of causes of action against Hall does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract. Rather, they comprised a single course of conduct designed to promote investment in [the client]. It is this same course of conduct which serves as the basis for [the later] litigation. The conduct at issue in both cases was arguably the 'same' and at the very least 'related' in any common sense understanding of the word."

In *Bay Cities,* the attorney representing a general contractor filed a mechanic's lien, but failed both to serve a stop notice on the construction's lenders and to file a complaint to foreclose the mechanic's lien. 21 Cal.Rptr.2d 691, 855 P.2d at 1264. Consequently, being unable to collect the amount it was owed, the general contractor filed a malpractice action against the attorney, whose professional liability policy limited coverage to $ 250,000 "for each claim." Under the policy, "Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim." *Id.* The court rejected the plaintiff's argument that the two acts of negligence constituted two claims for

purposes of the policy's "per claim" maximum coverage. *Id.* at 1270. It held, in any event, that, if two claims, they were "related" within the contemplation of the policy, noting:

> "The two errors by the attorney are 'related' in multiple respects. They arose out of the same specific transaction, the collection of a single debt. They arose as to the same client. They were committed by the same attorney. They resulted in the same injury, loss of the debt. No objectively reasonable insured under this policy could have expected that he would be entitled to coverage for two claims under this policy."

*Id.* at 1275.[6]

*Brooks* is quite similar. There, an attorney prepared four quitclaim deeds and a durable power of attorney for the attorney's client. 698 So.2d at 765. Her professional liability policy limited the carrier's liability, as follows:

> "[T]he limit of liability stated for 'each claim' is the maximum we will pay for all claims and claim expenses arising out of, or in connection with, the same or related wrongful acts."

*Id.* at 764. Holding that there was only one act of malpractice and, therefore, that the "per claim" limit of liability applied, the court commented:

> "Although the record shows that Egbert committed various acts of malpractice in connection with preparing deeds, wills, and a power of attorney, all of those acts, in our judgment, led to a single result that formed the basis of Brooks's claim: the loss of title to property."

*Id.* at 765.

At issue in *Chemstar* were what constitutes an occurrence under a third party insurance contract and when the coverage under the policy is triggered among successive policy years.

---

6. The court also held that the term, "related", as used in the policy and under the circumstances, is not ambiguous and is not limited to those acts that are causally related. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263, 1275 (1993).

Twenty eight homeowners, who purchased high-periclase lime plaster, manufactured by Chemstar and intended for exterior use only, sued Chemstar and a distributer when they used the lime plaster on the interior of their homes and the plaster pitted. Chemstar sought indemnity and defense from its insurer, whose policy required it to "pay on behalf of the insured all sums which the insured shall become obligated to pay by reason of the liability imposed on the insured ... for damages because of ... destruction of tangible property during the policy period ... caused by an occurrence." 41 F.3d at 431. The court determined that all of the plaster pitting claims arose from a single occurrence, and that the underlying cause of the plaster pitting was the failure of the distributer to warn the end users that it was not suitable for interior use. *Id.* at 431–32. Noting that there was no intervening, proximate cause after the failure to warn, the court concluded that

"the fact that the 28 incidents of pitting involved different homes, claimants, sources of lime, and times does not preclude a finding that the incidents arose from the same underlying cause."

*Id.* at 433. To like effect is *Mead,* except that, instead of plaster pitting, in that case the court determined that 11 of 12 § 1983 lawsuits stemmed from one occurrence, the 11 complaints alleging "the same excessive force policy and being premised upon the City's deliberate indifference to excessive force by its police department." 873 F.2d at 1187–88.

In *Atlantic Permanent,* one of the issues was the number of deductibles applicable to a directors and officers liability insurance policy where multiple plaintiffs brought multiple claims against the insured officers. 839 F.2d at 219. The plaintiffs were loan customers who sued the Savings and Loan, its subsidiary and three of its officers, alleging that they "had engaged in various fraudulent and deceptive sales tactics in connection with Atlantic's home improvement loan program." *Id.* at 213. The court affirmed the district court's holding that "when the claims asserted against the insureds arise out of a series of interrelated acts—here, the planning and carrying out of Atlantic's home improvement program—they should be

treated as a single 'loss' for the purposes of calculating the deductible." *Id.* at 219.

This is the position espoused by the appellees.

The appellants, not surprisingly, see the resolution of the issues in this case quite differently. They point out that, under the professional liability policy at issue in this case, only damages and claims "arising out of the same, related or continuing Professional Services" fall within the insurance company's liability. What constitutes the same or related professional service is, the appellants contend, ambiguous.

Noting that the American Heritage Dictionary of the English Language 1539 (4th ed.2000), defines "same" as "the very one; identical," the appellants argue that, as the claim of each of the Beale children is a separate and distinct case, requiring the rendering of professional services personal to the particular child, the professional services performed, or not performed, in that case are not the same professional services performed, or not performed, in the case of the other children. The professional services rendered in the case of one of the children, to be sure, may be the same services for purposes of the claims of persons other than another client, i.e. those, like the claim of the child's mother perhaps, dependent on the claim of that child. Thus, the appellants submit that there are two reasonable and logical interpretations of the term, "same." They also reject the appellee's argument that, since the five cases were consolidated and then all of them were neglected, with nothing being done in any of them, with the result that they were all dismissed at the same time, the same professional service was rendered to each—"each child received the same legal service of total neglect."

The appellants also deny that the claims are related. First, they maintain that the term, "related" is ambiguous. Referring again to the dictionary definition, the appellants note that "related" is defined as "connected, associated," American Heritage Dictionary of the English Language 1473 (4th ed.2000), and "standing in relation: connected; allied; akin." Black's Law Dictionary, 1288, (6th ed.1990). From these definitions,

they point out, two lines of cases have evolved, one exemplified by *Scott v. American National Fire Ins. Co.*, 216 F.Supp.2d 689 (N.D.Ohio 2002), in which the relatedness is causal, and the other, in which the relatedness may be either solely "logical" or both logical and causal. Under either approach, the appellants submit, the applicable limit of liability is the aggregate one. This is so, they assert, because that result is dictated by the rules of construction applicable to the interpretation of contracts of insurance:

> "Where terms are ambiguous, extrinsic and parol evidence may be considered to ascertain the intentions of the parties. *Cheney, supra,* 315 Md. at 766–67, 556 A.2d [at 1138]. 'Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer.' *Id.* Nevertheless, 'if no extrinsic or parol evidence is introduced, or if the ambiguity remains after consideration of the extrinsic or parol evidence that is introduced, it will be construed against the insurer as the drafter of the instrument.' *Id.; see also, e.g., Collier [v. MD–Individual Practice Ass'n,* 327 Md. 1, 5–6, 607 A.2d 537, 539 (1992)]; *Mut[ual] Fire, Marine & Inland Ins. [Co.] v. Vollmer,* 306 Md. 243, 251, 508 A.2d 130[, 134] (1986); *St. Paul Fire & Marine Ins. [Co.] v. Pryseski,* 292 Md. 187, 193–96, 438 A.2d 282[, 285–87] (1981); *Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 435, 418 A.2d 1187[, 1191] (1980); *Aragona v. St. Paul Fire & Marine Ins. [Co.],* 281 Md. 371, 375, 378 A.2d 1346[, 1349] (1977)."

*Bushey v. Northern Assur. Co. of America,* 362 Md. 626, 632, 766 A.2d 598, 601 (2001), quoting *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508–09, 667 A.2d 617, 619 (1995).

As in this case, they point out, no parol evidence of proof of industry standards as relates to the language under review was offered and nothing was offered as to any "technical meanings or meanings deviating from common usage."

The first approach, which the appellants urge the Court to adopt, they state is "an objective viewing of whether the services provided were related by one's being caused by the

other." In this case, they submit that "[n]ot only were the attorney's duties to each of the children distinct and separate—since the set of duties were owed separately in each child's case to that individual child—but the breach of the duties owed to each child resulted in distinct, separate harm to each child." Thus, they say, that the attorney's actions with respect to each of the Beale children coincided temporally was mere coincidence:

> "The same mistake was just made at the same time in each of the children's cases. The lack of knowledge as to the appropriate way to handle a lead poisoning claim merely became apparent in five cases at once because of the unfortunate happenstance that all five of those cases were filed together because of their common facts."

The appellants acknowledge that there may be, and "were, causally related legal errors" "within any one child's case," i.e., to each child, the claims of the parents.

Turning to the second approach, the appellants insist that, because it focuses on "related" in the abstract and, so viewed, it is "broad enough to encompass non-causative relationships," it leads to a slippery slope; "[i]n some manner," they argue, "everything is related to everything else". To avoid what they perceive to be an illogical result,

> " . . . the Appellants urge that even if this next line of cases is applied and 'logical' connections are enough to make legal services related, the rule that the proposed logical connection cannot be 'too attenuated' and also must comport with the reasonable expectations of the contracting parties, dictates the same ruling in the instant case—that there are five claims subject to the aggregate limit. This is so because any proposed 'logical connection' between the legal services provided the children which makes them not separate, individual claims is not reasonable in the context of the policy of legal malpractice insurance. All proposed 'logical connections' among the legal services which would make them one claim render the existence of an aggregate limit in the policy unnecessary surplusage and requires that the policy

be interpreted contrary to the reasonable expectations of the parties."

## II

 We agree with the appellants that the claim of one of the Beale children does not arise out of the same or related professional services rendered by the attorney in the case of one of the other children. We reach this conclusion for two reasons.

 It is well settled in Maryland, that "insurance policies, like other contracts, are construed as a whole to determine the parties' intention." *Bushey v. Northern Assurance Co. of America,* 362 Md. 626, 631, 766 A.2d 598, 600 (2001). This Court has made it clear that with insurance contracts "words are given their 'customary, ordinary and accepted meaning,' unless there is an indication that the parties intended to use the words in a technical sense." *Id.* The "ordinary" meaning of a word is properly tested by "what a reasonably prudent lay person would attach to them." *Id.* If the language in the policy suggests more than one meaning to a reasonably prudent layperson, then it is ambiguous, and parol and/or extrinsic evidence may be introduced to determine the intent of the parties. *Id.* at 631–32, 766 A.2d at 600–601. If, however, no parol and/or extrinsic evidence is offered, or where the ambiguity remains after its consideration, and the policy was drafted entirely by the insurance company, as is usually the case, the policy is construed against the insurance company as the drafter of the instrument. *Id.* at 632, 766 A.2d at 601. February 17, 2004.

In the case *sub judice,* neither parol nor extrinsic evidence was offered or considered by the trial court. Therefore, to the extent that either or both of the terms, "same" and "related," is ambiguous, the limit of liability provision must be construed against the appellee as the drafter of the provision and in favor of the appellants. That would mean applying the aggregate limit of liability.

More important, we believe, the parties' intentions are more accurately determined by recognizing, and giving effect to, the duty that an attorney owes to each client individually and separate and apart from that owed his or her other clients. The case law applicable to this situation and interpreting insurance policy provisions both identical, and similar, to those at issue *sub judice,* including some of the cases relied on by the appellee, support this result.

*Scott v. American National Fire Insurance Company, Inc.,* 216 F.Supp.2d 689 (N.D.Ohio 2002) was a malpractice action brought by clients of an attorney as a result of that attorney's activities in connection with the creation of a corporation, formed to manufacture and market golf equipment and apparel, that failed. Two of the clients were investors in the corporation that was formed and the third was the corporation. The professional liability policy at issue in that case provided that "[c]laims alleging, based upon, arising out of or attributable to the same or related acts, errors, or omissions shall be treated as a single claim regardless of whether made against one or more than one insured." After the suit was filed, the attorney sought a declaratory judgment to establish the limits of coverage. Concluding that the attorney represented three separate clients and that each of them was owed different duties and responsibilities, the court held that the aggregate limit of liability applied. It explained:

> "Scott's malpractice actions are unrelated because Scott owed separate and distinct duties to Stimer, Ungar, and RIPIT. Further, the investors' rights are separate from RIPIT's rights. For example, Stimer and Ungar had a separate right to be protected from exposure to personal liability for RIPIT's obligations. Scott had a corresponding duty to properly incorporate RIPIT to shield Stimer and Ungar from corporate liability. This duty is separate and unrelated to Scott's duty to RIPIT to properly transfer Ackerman's intellectual property rights. Scott also had a duty to RIPIT to learn the status of the USGA's approval of the RIPIT 1357 club to ensure that Ackerman's patent and trademark rights had value. This duty is different in kind

from the duty Scott owed Ungar and Stimer. RIPIT had a corresponding right to have Scott ensure that Ackerman's intellectual property rights had value."

*Id.* at 695. The *Scott* court relied on *St. Paul Fire & Marine Ins. Co. v. Chong,* 787 F.Supp. 183 (D.Kan.1992); *Continental Cas. Co. v. Grossmann,* 271 Ill.App.3d 206, 207 Ill.Dec. 719, 648 N.E.2d 175 (1995). *See also Nat'l Union Ins. Co. of Pittsburgh, Pa. v. Holmes & Graven, Chartered,* 23 F.Supp.2d 1057 (D.Minn.1998); *Continental Cas. Co. v. First Arlington Investment Corporation,* 497 So.2d 726 (Fla.App.1986).

*Chong* was also a declaratory judgment action to determine the policy limits of an attorney's professional liability insurance policy. 787 F.Supp. at 184. There the attorney had represented, in a single trial, three defendants, each charged with kidnaping. *Id.* at 186. The policy provided that $ 100,-000.00 "is the most we'll pay for all claims that result from a single wrongful act or a series of related wrongful acts." *Id.* The critical issue, therefore, was the interpretation of the phrase, "series of related wrongful acts." *Id.* It was stipulated that the attorney committed at least 25 negligent actions and omissions with respect to each defendant and that those actions and omissions were similar as to each defendant, but not identical. *Id.* at 188. Finding the term "related and the phrase series of related wrongful acts" to be ambiguous and, therefore, construing the policy most favorably to the insured, the court held that the defendants' claims did not arise out of a "series of related wrongful acts," but, rather, were the result of "multiple discrete omissions and actions on the part of [the attorney] which resulted in discrete losses to each of the three defendants." *Id.* The court then stated:

"Without engaging in a lengthy review of an attorney's obligations to his clients, the court notes, as have the defendants, that [the attorney] owed separate duties to each of the three defendants. In order to protect the individual interests of Chang, Chong and Kim, it was necessary for [the attorney] to render separate services which were distinct to each of them."

*Id.*, quoting *First Arlington Investment Corporation,* 497 So.2d at 728. With respect to this latter point, the court elucidated:

> "Even focusing solely on [the attorney's] advice to each defendant to plead guilty, the court finds that such acts are separate wrongful acts. Although the criminal charges may have arisen out of the same set of events, each defendant clearly was in a different position and arguably had his own set of defenses. Further, each defendant was arguably at a different level with respect to his ability to speak and understand English. In short, each defendant brought a unique set of circumstances with him which should have been considered by [the attorney] in deciding how to advise each defendant."

*Id.* at 188 n. 6.

In *First Arlington Investment Corporation,* an attorney, retained by their insurance carrier, represented First Arlington, who owned the real property, and LaPlaya, the owner of the resort built on that real property and a pier extending from it, in connection with a personal injury action brought against them. 497 So.2d at 727. Having been found liable for the injury and assessed damages well in excess of their insurance coverage, First Arlington and LaPlaya sued their insurance carrier and the attorney. They alleged that the attorney committed errors or oversights in his representation. *Id.* Specifically, the plaintiffs complained that the attorney had only one file and defended both clients when there was a conflict of interest, First Arlington having transferred all of the improvements to LaPlaya and leased to it the underlying land where the accident occurred. *Id.* at 727–28. The insurance policy provided that the total limit of the carrier's liability for each claim was "all damages arising out of all acts or omissions in connection with the same professional service regardless of the number of claims or claimants." Concluding that the per claim limit did not apply, the court pointed out:

> "This is not a case where a lawyer was representing two clients with consistent positions. In order to protect each of his clients, it was necessary for him to render separate

services which were distinct to each of them. The damages to each party were caused when [the attorney] failed to raise the defenses appropriate to each party. Thus, the damages did not arise from the same professional service but arose from acts or omissions in the separate and distinct professional services [the attorney] provided, or should have provided, to the two clients."

*Id.* at 728.

*Grossmann* is to like effect. There, three clients brought malpractice actions against an attorney and, at the same time, charged the attorney and another, in other counts of the complaint with breach of three separate contracts, fraud and breach of fiduciary duties, all involving the sale of stock in a corporation. 207 Ill.Dec. 719, 648 N.E.2d at 176. The attorney sought a defense from his professional liability insurer, which counter claimed, joining the plaintiffs, and demanding a judgment limiting the attorney's right of recovery to the per claim limit of the policy. *Id.* Because the policy limited its liability to $ 100,000.00 in respect to "all claims or claim expenses arising out of, or in connection with, the same or related wrongful acts," and the malpractice action was by three clients, the insurer argued that there was only one claim within the meaning of the policy. *Id.* The trial court agreed. Finding that "the thread of these claims was ... one act," the attorney's lying to investors, it held that all of the alleged wrongful acts were related within the meaning of the policy and that the per claim limit applied. *Id.* at 176–77. The Illinois Appellate Court disagreed. Having noted the inappropriateness of the trial court's declaration of a limit on policy coverage in advance of trial, the court explained:

"Here, the insurer's liability will not be maximized if the underlying plaintiffs prove all of their allegations, as the trial court assumed. Instead, the insurer may have greater liability if [the attorney] succeeds in disproving the allegation that he knowingly participated in Plantan's scheme to defraud the underlying plaintiffs. The alleged acts of malpractice become, then, entirely separate negligent mistakes, involving different transactions, different persons, and dif-

ferent bank accounts, related only in the coincidence that all of the acts in some way relate to various investments in or by the Springdale Corporation.

"The insurer may be liable for more than $100,000 based on many sets of acts alleged in the complaint, which remain unrelated unless the plaintiffs prove [the attorney's] participation in the fraudulent scheme."

*Id.* at 177–78. The court set out sets of negligent acts as examples of possible jury findings that would result in the attorney and the insurer being liable to the plaintiffs for three unrelated acts. *Id. See Nat'l Union Ins. Co. of Pittsburgh, Pa.,* 23 F.Supp.2d at 1070 (malpractice claims unrelated where the losses generated by the attorney's mistakes were different and not coterminous).

The cases on which the trial court and the appellee relied are not to the contrary; in fact, they are quite consistent. None of those cases involves separate professional services. In *Bay Cities,* the question was "whether, when an attorney commits two separate acts of negligence in the same matter that preclude his client's right to recover a single sum against either of two other parties, on either of two legal theories, the attorney's malpractice insurer is liable for only one claim under the policy, or is liable for two claims." 21 Cal.Rptr.2d 691, 855 P.2d at 1275, Kennard, J., Concurring. *Brooks* likewise involved the commission of multiple errors in the representation of a single client. 698 So.2d at 763–65.

In both *Gregory* and *Wendt,* the attorney was engaged in a course of conduct designed to encourage investment in his client or his client's notes. *Gregory,* 876 F.2d at 605; *Wendt,* 205 F.3d at 1264. In *Gregory,* the attorney was brought into the litigation by his client, who had been sued by its investors,[7] via a cross-claim for malpractice. Thus, there was but one claim arising out of professional services in that case. The attorney in *Wendt* was sued by a selling agent of his client,

---

**7.** There is no inconsistency between advice given a client or work done for a client forming the basis for, and being related to, a claim made by third parties with whom the advice or work is shared.

who filed a third party complaint against him, alleging that he had made misrepresentations concerning the legality of the client's notes. The court noted that, notwithstanding the third party complaint,

> "the case does not present separate professional services. [The attorney] allegedly held himself out as an attorney who had particular knowledge of securities law and who represented to investors and agents of K.D. Trinh, the legality of the promissory notes."

205 F.3d at 1262 n. 1.

The attorney in this case undertook to represent each of the Beale children. Although each of them had been exposed to, and poisoned by, the lead paint in the house that they shared and, therefore, those were facts in common to all, their cases were not at all identical. The extent of the poisoning and, hence, the injury to each child and, ultimately, the amount of damages to which each was entitled as a result were, and are, clear differences. Consequently, the result in one case would not foreshadow, necessarily, the result in any of the others. Moreover, the attorney owed a duty to each of the children; he could not rely on the service rendered in one case being sufficient to meet the needs of the client in any of the other cases. In other words, an investigation as to one child, or having that child examined, applies only with respect to that child; it provides no information with respect to, and furthers not at all, the case of any other child. Thus, while the same skill set and process, those proven to be effective in the representation of clients lead paint cases, may have been applicable to the handling of all of the Beale cases, because of the individual differences in the children and the distinct and separate duty that the attorney owes to each, the utilization of those skills and process in the rendering of professional services on behalf of one of the children is not the same professional service as, or even related to, the professional services that must be rendered on behalf of the other children. By parity of reasoning, an omission—the failure to utilize the skills and process, thus neglecting each of the cases,—does not

make related, or the same, that which would not have been related, or the same, if it were an action.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF JUDGMENT IN FAVOR OF THE APPELLANTS AND A DECLARATION THAT THE AGGREGATE LIMIT OF LIABILITY APPLIES TO THE APPELLANTS' CLAIMS AGAINST THE APPELLEE. COSTS TO BE PAID BY THE APPELLEE.