**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ADEDIJI ADESOLA SOREMEKUN,
          *Plaintiff-Appellant,*

                    v.

THRIFTY PAYLESS, INC., d/b/a RITE
AID CORPORATION, a California
corporation,

          *Defendant-Appellee.*

No. 06-55035

D.C. No.
CV-04-06868-
MMM

ORDER

Appeal from the United States District Court
for the Central District of California
Margaret M. Morrow, District Judge, Presiding

Submitted November 9, 2007*
Pasadena, California

Filed November 27, 2007

Before: Kim McLane Wardlaw, Carlos T. Bea, and
N.R. Smith, Circuit Judges.

## ORDER

We adopt and affirm the district court's well-reasoned
Order Granting Defendant Thrifty Payless, Inc.'s Motion for
Summary Judgment, filed November 23, 2005, attached as
Appendix A.

*The panel unanimously finds this case suitable for decision without
oral argument *See* Fed. R. App. 34 (a) (2).

15201

**AFFIRMED.**

**APPENDIX A**
# UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADEDIJI ADESOLA SOREMEKUN, *Plaintiff,* v. THRIFTY PAYLESS, INC. d/b/a RITE AID CORPORATION, a California corporation; DOES 1 through 100, inclusive, *Defendants.* | CASE NO. CV 04-06868 MMM (VBKx) ORDER GRANTING DEFENDANT THRIFTY PAYLESS, INC.'S MOTION FOR SUMMARY JUDGMENT |

Adediji Adesola Soremekun filed this action against Rite Aid Corporation, Ismail Keekeebha, Sharim Manek, and certain unnamed defendants in Los Angeles Superior Court on January 15, 2004. On July 21, 2004, he filed an amended complaint, naming Thrifty Payless, Inc. ("Thrifty"), doing business as Rite Aid Corporation ("Rite Aid"), and Does 1 through 100 as defendants.[1] Soremekun, a former Rite Aid employee, alleged that defendants had intentionally engaged in a practice of failing to compensate him in accordance with the governing collective bargaining agreements.[2] Specifically, he asserted that Rite Aid refused to pay him wages purportedly owed for overtime work and bereavement leave.[3] Based on these allegations, Soremekun asserted claims for breach of contract, failure to pay wages in violation of the California

---

[1] The first amended complaint did not name either Keekeebha or Manek.

[2] First Amended Complaint, ¶ 16.

[3] *Id.,* ¶¶ 14, 15, 16, 17, 19.

Labor Code, quantum meruit, and unfair business practices in violation of California Business & Professions Code §§ 17200 et seq.

On August 17, 2004, Thrifty removed the action to this court, asserting that it raised a federal question. Soremekun filed a motion to remand on September 16, 2004, arguing that the court lacked subject matter jurisdiction and that Thrifty's removal was untimely. The court denied Soremekun's motion on October 29, 2004. Thrifty now moves for summary judgment, or in the alternative, partial summary judgment.

## I.   FACTUAL BACKGROUND

Adediji Soremekun was employed by Rite Aid as a pharmacist from approximately January 15, 1998, until his resignation on June 27, 2003.[4] Soremekun's employment at Rite Aid was governed by successive collective bargaining agreements ("CBAs") between Rite Aid and the United Food and Commercial Workers Union (the "Union").[5]

### A.   Pay Provisions

Under the collective bargaining agreement for the period from July 5, 1999 to July 7, 2002 (the "1999-2002 CBA"),[6]

---

[4][Proposed] Statement of Uncontroverted Facts and Conclusions of Law ("Def.'s Facts"), ¶ 1; Plaintiff Adediji A. Soremekun's Separate Statement of Disputed Material Facts ("Pl.'s Facts"), ¶ 1.

[5]'Def.'s Facts, ¶ 2; Pl.'s Facts, ¶ 2. Plaintiff contends that he received a copy of the CBA only after he had filed a complaint with the Division of Labor Standards and Enforcement. (Pl.'s Facts, ¶ 2.)

[6]Declaration of Glenn L. Briggs in Support of Defendant Thrifty Payless, Inc. d/b/a/ Rite Aid Corporation's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Briggs Decl."), Exh. C at 47 (Retail Pharmacist Agreement between Rite Aid Inc. and UFCW Locals 135, 324, 770, 1036, 1167, 1428 and 1442 (July 5, 1999 -July 7, 2002) ("1999-2002 CBA"), Art. 16.A). Neither party has submitted the collective bargaining agreement in force between January 15, 1998 and July 5, 1999.

Rite Aid was obligated to pay pharmacists overtime at a rate of time and a half, for any work performed in excess of eighty hours a week within a consecutive two-week period between July 5 and October 1, 1999.[7] Effective October 11, 1999, if authorizeili by a written agreement between Rite Aid, the Union, and the employee, a pharmacist could "work an alternate work schedule consisting of no more than twelve (12) hour shifts at straight time."[8] In such a case, Rite Aid was obligated to pay the employee double time for any work exceeding twelve hours in an alternate shift, and time and a half for any work over forty hours in a given workweek.[9] In addition, Rite Aid was required to pay pharmacists for time spent traveling between stores during the work day, at the regular rate;[10] for "on call" time, in the amount of four hours' pay at the appropriate rate;[11] and for work between the hours of 10 p.m. and 7 a.m. at a premium of one dollar per hour in addition to the straight-time rate.[12] Finally, Rite Aid guaranteed paid bereavement leave in the event of the death of an employee's immediate family member,[13] as well as specified vacation time with full pay.[14] The collective bargaining agreement for the period from July 8, 2002 to July 10, 2005 (the "2002-2005 CBA) contained similar provisions regarding pharmacists' hours and wages.[15]

---

[7]*Id.,* Exh. C at 41 (1999-2002 CBA, Art. 7.C.1).

[8]*Id.,* Exh. C at 38 (1999-2002 CBA, Art. 6.C.1).

[9]*Id.*

[10]*Id.*, Exh. C at 42 (1999-2002 CBA, Art. 7.G).

[11]*Id.,* Exh. C at 38-39 (1999-2002 CBA, Art. 6.C.3).

[12]*Id.,* Exh. C at 41 (1999-2002 CBA, Art. 7.B).

[13]*Id.,* Exh. Cat 46 (1999-2002 CBA, Art. 11).

[14]*Id.,* Exh. C at 43 (1999-2002 CBA, Art. 8.A).

[15]*Id.,* Exh. D at 57, 62, 64, 66, 70 (Retail Pharmacist Agreement Rite Aid, Inc. (July 8, 2002 - July 10, 2005) ("2002-2005 CBA"), arts. 6.3.1.1, 7.3.1 ("Pharmacists will be paid one and one-half times (1 1/2 x) the regular straight-time rate on all hours worked over ten (10) per day, double time (2 x) the regular straight-time rate on all hours worked over twelve

### B.  Grievance Procedures

Under both the 1999-2002 and 2002-2005 CBAs, the Union, Rite Aid, and all covered employees were required to adhere to certain grievance procedures for the resolution or settlement of "[a]ny and all matters of controversy, dispute or disagreement of any kind or character existing between the parties arising out of or in any way involving the interpretation and/or application of the terms of this Agreement."[16] Under these grievance procedures, an employee with a claim regarding a wage discrepancy, such as a claim "for unpaid wages, holidays, vacation, jury duty, sick leave, bereavement pay, or night premium pay, or for any other direct compensa-

---

(12) per day and one and one-half times (1 1/2 x) the regular straight-time rate on all hours worked over forty (40) per week"), Art. 6.3.3 ("If the Employer requires an employee to remain at home 'on call' the Employer shall guarantee the employer four (4) hours' pay at the appropriate rate for such day. All Employer requests for an employee to remain available for 'on call' duty shall be in writing to the employee"), Art. 7.2 ("A premium of one dollar ($1.00) per hour in addition to the applicable straight-time rate shall be paid on all hours worked by employees between the hours of 10 P.M. and 7 A.M."), Art. 7.7 ("Whenever an employee is required by the Employer to change from one (1) store to another during the same day, all time consumed by said employee in going either to or from one (1) store to another shall be considered and paid for as part of the employee's regular duties"), Art. 8.1.3 ("All full-time employees who have been continuously employed by the Employer for five (5) years shall receive three (3) weeks' vacation with full pay"), Art. 8.2.1 ("The term 'full pay' shall be defined as forty (40) hours' pay at the employee's straight-time hourly rate which was in effect at the time the vacation became due on the employee's anniversary date"), Art. 11 ("Leave for all employees shall be provided because of death of a member of the employee's immediate family. . . . Verification of time required for such paid leave shall be supplied to the Employer by the employee, if requested. Immediate family shall be defined as the employee's spouse, child, mother, father, stepparent, brother, sister, mother-in-law, father-in-law, grandchild, grandparent, stepchild, legal guardian, or other relative living in the employee's home").

[16]*Id.,* Exh. C at 47 (1999-2002 CBA, Art. 16.A), Exh. D at 71 (2002-2005 CBA, Art. 16.1).

tion," had to file the claim with the Union "promptly upon discovery."[17] Once the employee filed a claim, the Union was obligated, "if it believe[d] such claim ha[d] validity," to notify the employer promptly about the claim.[18] The CBAs set time limits for the filing of claims and the initiation of grievance procedures. Under the 1999-2002 CBA, "[a] claim not filed by the employee with the Union within ten (10) days after discovery and not filed by the Union with the Employer within an additional ten (10) days, [was to] be deemed null and void. (The Union has twenty (20) days from the employee's date of discovery to file notice with the Employer.)"[19] The 2002-2005 CBA extended the time for an employee to file a claim to twenty-one days after discovery.[20] Both CBAs limited Rite Aid's liability in the following manner:

> "Notwithstanding the foregoing, no wage or other direct compensation claim not involving interpretation of the contract can cause such Employer to pay such claim or any portion thereof retroactively for a period of more than six (6) months immediately prior to the date of the Employer's receipt of notice from the Union of the claim. In any event, the Employer's obligation to compensate an employee for unpaid time worked under Article 7-E, shall not be limited in any way by the foregoing, except for the six (6) month limitation.

---

[17]*Id.,* Exh. C at 47 (1999-2002 CBA, Art. 16.8.3), Exh. D at 72 (2002-2005 CBA, Art. 16.2.3).

[18]*Id.*

[19]*Id.,* Exh. C at 47 (1999-2002 CBA, Art. 16.B.3).

[20]*Id.,* Exh. D at 72 (2002-2005 CBA, Art. 16.2.3 ("A claim not filed by the employee with the Union within twenty-one (21) days after discovery and not filed by the Union with the Employer within an additional ten (10) days, shall be deemed null and void. (The Union has thirty-one (31) days from the employee's date of discovery to file notice with the Employer.)").

The Employer shall promptly investigate all claims for failure to pay or incorrect payment of wages and premiums for time worked and pay any discrepancies within twenty one (21) days of the date it is brought to the Employer's attention. Failure to do so, will result in valid claims earning a penalty of ten percent (10%) of the amount owed. After the twenty second (22nd) day, an additional penalty of ten percent (10%) per week will be owed for each week until the claim is paid.

The claim shall include the employee's name, social security number, store number, approximate time period and nature of the claim."[21]

The CBAs established the following grievance procedure:

Step 1 — Store Level. Employees, either directly or with their Union representative, shall attempt to settle or resolve any dispute with their Store Manager or supervisor within ten (10) days after discovery of the event giving rise to the grievance. In the event the matter or dispute is not settled or resolved, the employee shall have ten (10) days in which to file a written protest with the Union with a copy of such notice to the Employer.

The written grievance shall reasonably describe as fully as possible the matter at issue and contract provision alleged to have been violated, including the names of the individual(s) involved and the date(s) of the alleged violation, and the remedy sought.

Step 2 — Formal Meeting. Upon receipt of an employee's written protest, as detailed in Step 1,

---

[21]*Id.,* Exh. C at 47 (1999-2002 CBA, Art. 16.B.3), Exh. D at 72 (2002-2005 CBA 16.2.3).

either party may request a formal grievance meeting. Upon receipt of written notice from either party, representatives of the Employer and representatives of the Union shall meet within one (1) calendar week in order to attempt to settle or resolve the matter. Any request for a formal grievance meeting must be submitted within ten (10) days after receipt of the employee's written protest.

Step 3 — Arbitration. Any matter not settled or resolved in Step 2 may be submitted to arbitration by either party to this Agreement, i.e., the Employer or the Union, provided that written demand for arbitration must be made within forty-five days from the date of occurrence. Failure to comply within the time limits contained in this Paragraph and/or Steps 1 and 2 shall render the grievance null and void. Any rights possessed by either the Union or the employee with respect to arbitration shall be irrevocably waived. . . ."[22]

Soremekun contends that he did not receive a copy of the CBAs until June 2003, after he filed a complaint with the California Department of Labor Standards Enforcement.[23] Although he knew that the Union existed and knew that Union dues were deducted from his paycheck, Soremekun contends that "no one from the Union informed [him] about, or gave [him] a copy of, the Collective Bargaining Agreement; and no one ever discussed with [him] any of the provisions of the Agreement while [he] was employed with Rite Aid."[24]

---

[22]*Id.,* Exh. C at 47-48 (1999-2002 CBA, Art. 16.B.4), Exh. D at 72-73 (2002-2005 CBA, Art. 16.2.4.

[23]P1.'s Facts, ¶ 2; Declaration of Adediji Adesola Soremekun in Support of Opposition Defendants' Motion for Summary Judgment, Etc. ("Soremekun Decl."), ¶ 2.

[24]Soremekun Decl., ¶ 3.

## C.   Soremekun's Complaints

Beginning in 1998, Soremekun made repeated complaints regarding his wages to his managers at Rite Aid, either through the computer message system or in written correspondence.[25] Soremekun also wrote numerous letters to his Union representatives detailing his complaints.[26] He did not, however, file an official grievance form with the Union.[27] As a result, Thrifty asserts that Soremekun never invoked the grievance procedure set forth in the CBAs regarding his unpaid wages claims.[28]

---

[25]Def.'s Facts, ¶ 3; Pl.'s Facts, ¶ 3.

[26]See Briggs Decl. Exh. E at 76 (Oct. 27, 2000 Letter from Soremekun to Rite Aid re: Adediji A. Soremekun — Employee #802731, SS# 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), Exh. E at 77 (Dec. 4, 2001 Letter from Soremekun to Mike Calderella, Union Representative and Mike A. Straeter, President re: Non-Payment of Salary by Rite Aid), Exh. E at 78-82 (Dec. 18, 2001 Letter from Soremekun to Calderella), Exh. E at 83-84 (Undated Letter from Sorekemun to Calderella and Straeter re: Adediji A. Soremekun, Pharmacist at Rite Aid Store 5489. Member Local 1442), Exh. E at 85 (Dec. 30, 2001 Letter from Soremekun to Calderella), Exh. E at 86 (Nov. 15, 2001 Letter from Soremekun to Calderella and Straeter re: Adediji A. Soremekun, Pharamacist at Rite Aid Store 5489. Member UFCW Local 1442).

See also Soremekun Decl., ¶¶ 14, 15, 16; Exh. 2 (Oct. 27, 2000 Letter from Soremekun to Rite Aid re: Adediji A. Soremekun — Employee #802731, SS# 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), Exh. 3 (June 6, 2000 Letter from Soremekun to Calderella), Exh. 4 (Dec. 4, 2001 Letter from Soremekun to Calderella and Straeter re: Non-Payment of Salary by Rite Aid), Exh. 5 (Dec. 18, 2001 Letter from Soremekun to Calderella), Exh. 6 (Undated Letter from Sorekemun to Calderella and Straeter re: Adediji A. Soremekun, Pharmacist at Rite Aid Store 5489. Member Local 1442), Exh. 7 (Nov. 15, 2001 Letter from Soremekun to Calderella and Straeter re: Adediji A. Soremekun, Pharamacist at Rite Aid Store 5489. Member UFCW Local 1442), Exh. 8 (Dec. 30, 2001 Letter from Soremekun to Calderella).

[27]Def.'s Facts, ¶ 4; Briggs Decl., Exh. B (Deposition of Adediji Adesola Soremekun ("Soremekun Depo.") at 26:21-24, 28:15-29:4).

[28]Thrifty contends that the Union never communicated Soremekun's claim for unpaid wages to Rite Aid, but offers no admissible evidence sup-

In December 2001, Soremekun communicated a grievance regarding warning notices and a suspension that he had received to Michael Calderella, his Union representative. In response to the grievance, Calderella sent a letter to Rite Aid's Human Resources Manager, stating that "[t]he warning notices and suspension were unwarranted and should be rescinded," and requesting a grievance meeting with Rite Aid to resolve the matter.[29]

Soremekun resigned his position at Rite Aid on June 27, 2003.[30] Prior to his resignation, in February 2003, Soremekun filed a claim for unpaid wages with the California Department of Labor Standards Enforcement, seeking nearly $51,000 in

porting the assertion. (Def.'s Facts, ¶ 5.) Soremekun contends that the Union advised him it had communicated his complaints to Rite Aid, and assured him that the payment problems would be resolved. (Pl.'s Facts, ¶ 5.) The reference to Soremekun's declaration that is cited, however, does not support this contention. (See Soremekun Decl., ¶ 9 (". . . I contacted both the union representative, Mike Calderella, and Rite Aid manager, and he was [sic] that they were going to look into my paycheck problem").) Soremekun's declaration, if proved true, would simply establish that the Union representative was going to investigate the paycheck complaint, not that the Union was going to communicate, or had already communicated, the grievance to Rite Aid in accordance with the formal procedures set forth in the CBAs. Moreover, Soremekun's testimony regarding the purported statements of the Union representative is inadmissible hearsay, as it is a statement by an out-of-court declarant offered for the truth of the matter asserted. See FED.R.EVID. 801, 802.

[29]Declaration of Theresa A. Whitman in Support of Defendant Thrifty Payless, Inc. d/b/a Rite Aid Corporation's Reply Supporting its Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Whitman Decl."), Exh. A (Dec. 10, 2001 Letter from Michael Calderella to Laura Peyto, Human Resources Manager, Rite Aid Corp., re: Adediji Soremekun SS# 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, Store #5489).

[30][Proposed] Statement of Uncontroverted Facts and Conclusions of Law ("Def.'s Facts"), ¶ 1; Plaintiff Adediji A. Soremekun's Separate Statement of Disputed Material Facts ("Pl.'s Facts"), ¶ 1.

allegedly unpaid wages for the period from February 1998 to November 2002.[31]

## II.  DISCUSSION

### A.  Legal Standards Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n,* 809 F.2d 626,

---

[31]Briggs Decl., Exh. B (Soremekun Depo. at 52:7-16), Exh. F.

630-31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED. R. CIV. PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Nelson v. Pima Community College,* 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment"); *Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

### B.   Whether Plaintiff's Failure To Exhaust Remedies Under The Collective Bargaining Agreements Bars Recovery Under His Breach of Contract, Quantum Meruit, And Unfair Business Practices Claims[32]

Thrifty argues that it is entitled summary judgment because Soremekun failed to exhaust the grievance procedure set forth in the CBAs.[33] Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185,[34] "provides a statutory

---

[32]In the order denying plaintiff's motion for remand, the court found that Soremekun's state law claims for breach of contract, quantum meruit, and unfair business practices in violation of Business and Professions Code § 17200 et seq. were preempted by § 301 of the LMRA. See *Caterpillar Inc. v. Williams,* 482 U.S. 386, 393-94 (1987) (explaining that complete preemption occurs where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule,' " and that state "claims founded directly on rights created by the collective-bargaining agreement, and also claims 'substantially dependent on analysis of a collective bargaining agreement" are completely preempted by federal law (citations omitted)). Although Soremekun did not thereafter amend his complaint, the court construes the preempted state law causes of action as stating a claim under § 301.

[33]Defendant Thrifty Payless, Inc.'s Memorandum of Points and Authorities in Support of its Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment ("Def.'s Mot.")

[34]As the court noted in denying Soremekun's motion to remand on October 27, 2004, section 301(a) of the LMRA preempts plaintiff's state law claims for breach of contract, quantum meruit, and unfair business

mechanism for vindicating contract rights under a collective bargaining agreement." *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 511 (9th Cir. 1978). Although claims arising under a collective bargaining agreement that concern questions of labor policy are generally reserved to the union, "it is well settled that rights which are personal rights of the employees may be enforced by them directly under section 301." *Id.* (citing *Hines v. Anchor Motor Freight, Inc,* 424 U.S. 554, 562 (1976), and *Smith v. Evening News Ass'n.,* 371 U.S. 195, 198-200 (1962)); see also *Del Costello v. Int'l Brotherhood of Teamsters,* 462 U.S. 151, 163 (1983) ("It has long been established that an individual employee may bring suit against his employer for breach of a collective bargaining agreement," citing *Smith, supra,* 371 U.S. 195). Where, as here, a former employee asserts claims involving "uniquely personal rights" regarding "wages, hours, [o]vertime pay, and wrongful discharge," a direct suit against the employer is proper under section 301. *Lerwill, supra,* 582 F.2d at 511 (quoting *Hines, supra,* 424 U.S. at 562 ("Section 301 contemplates suits by and against individual employees as well as between unions and employers; and contrary to earlier indica-

---

practices. See 29 U.S.C. § 185(a) ("Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties"); see *Franchise Tax Bd. of State of Cal. v. Construction Laborers Vacation Trust for S. Cal.,* 463 U.S. 1, 23 (1983) ("The preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.' Any such suit is purely a creation of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301"); see also *Lingle v. Norge Division of Magic Chef Inc.,* 486 U.S. 399, 404 & n.3 (1988) (holding that section 301 "mandate[s] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes").

tions s 301 suits encompass those seeking to vindicate 'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge")).

Prior to bringing suit, an employee seeking to vindicate personal rights under a collective bargaining agreement must first attempt to exhaust any mandatory or exclusive grievance procedures provided in the agreement. See *United Paperworkers Int'l. Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 37 (1987) ("The courts have jurisdiction to enforce collective-bargaining contracts; but where the contract provides grievance and arbitration procedures, those procedures must first be exhausted and courts must order resort to the private settlement mechanisms without dealing with the merits of the dispute"); *DelCostello, surpa,* 462 U.S. at 163 ("Ordinarily, however, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement. Subject to very limited judicial review, he will be bound by the result according to the finality provisions of the agreement" (citations omitted)).[35] Thus, in the ordinary case, an employee's failure to exhaust contractually mandated procedures precludes judicial relief for breach of the collective bargaining agreement and related claims.

An exception to the general requirement of exhaustion exists, however, where the employee demonstrates that "the union representing the employee in the grievance/arbitration procedure [has acted] in such a discriminatory, dishonest,

---

[35]See also *Hines, supra,* 424 U.S. at 563 ("[W]e [have] held that an employee could not sidestep the grievance machinery provided in the contract and that unless he attempted to utilize the contractual procedures for settling his dispute with his employer, his independent suit against the employer in the District Court would be dismissed"); *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652 (1965) ("As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress").

arbitrary, or perfunctory fashion as to breach its duty of fair representation. In such an instance, an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *DelCostello, supra,* 462 U.S. at 164 (citations omitted); *Vaca v. Sipes,* 386 U.S. 171, 177 (1967) (describing a union's duty of fair representation as a "statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct"); see also *Hines, supra,* 424 U.S. at 567 ("The union's breach of duty relieves the employee of an express or implied requirement that disputes be settled through contractual grievance procedures. . ."). This exception reflects the basic principle that a union that acts as the exclusive collective bargaining agent vis-a-vis the employer must fairly represent the members that give it such power. See *Vaca, supra,* 386 U.S. at 177 ("It is now well established that, as the exclusive bargaining representative of the employees in [plaintiff's] bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with [the employer] and in its enforcement of the resulting collective bargaining agreement" (citations omitted)); see also *Bowen v. U.S. Postal Service,* 459 U.S. 212, 226 (1983) ("By seeking and acquiring the exclusive right and power to speak for a group of employees, the union assumes a corresponding duty to discharge that responsibility faithfully — a duty which it owes to the employees whom it represents and on which the employer with whom it bargains may rely. When the union, as the exclusive agent of the employee, waives arbitration or fails to seek review of an adverse decision, the employer should be in substantially the same position as if the employee had had the right to act on his own behalf and had done so. Indeed, if the employer could not rely on the union's decision, the grievance procedure would not provide the 'uniform and exclusive method for [the] orderly settlement of employee grievances,' which the Court has recognized is essential to the national labor policy," citing *Clayton v. Int'l. Union Automobile, Aerospace & Agricultural Implement Workers,* 451 U.S. 679, 686-87 (1981)); *DelCostello, supra,* 462 U.S. at 165 n. 14 ("The duty of fair representation exists because it is the

policy of the National Labor Relations Act to allow a single labor organization to represent collectively the interests of all employees within a unit, thereby depriving individuals in the unit of the ability to bargain individually or to select a minority union as their representative. In such a system, if individual employees are not to be deprived of all effective means of protecting their own interests, it must be the duty of the representative organization 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct,' " quoting *Vaca, supra,* 386 U.S. at 177).

An employee can support an action for breach of the collective bargaining agreement, brought solely against the employer, by showing that the union violated its duty of fair representation. In such a case, the employee bears the burden of proving two claims — first, that the employer breached the collective bargaining agreement, and second, that the labor union breached its duty of fair representation. See *DelCostello, supra,* 462 U.S. at 165 ("To prevail against either the company or the Union, . . . [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both. The suit is thus not a straightforward breach of contract suit under § 301, . . . but a hybrid § 301/fair representation claim, amounting to a direct challenge to the private settlement of disputes under [the collective-bargaining agreement]" (citations and internal quotations omitted)); see *Vaca, supra,* 386 U.S. at 185-86 ("We think that another situation when the employee may seek judicial enforcement of his contractual rights arises, if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, and if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance. It is true that the

employer in such a situation may have done nothing to pre-vent exhaustion of the exclusive contractual remedies to which he agreed in the collective bargaining agreement. But the employer has committed a wrongful discharge in breach of that agreement, a breach which could be remedied through the grievance process to the employee-plaintiff 's benefit were it not for the union's breach of its statutory duty of fair representation to the employee. To leave the employee remediless in such circumstances would, in our opinion, be a great injustice").

Here, the governing CBAs establish mandatory grievance procedures that must be followed by employees asserting a violation of the terms of the agreements.[36] It is undisputed that Soremekun did not exhaust these contractual procedures; no official grievance form was filed,[37] no formal grievance meeting was held, and no arbitration proceeding was initiated.[38] Soremekun contends, however, that his failure to exhaust contractual remedies must be excused because the Union never gave him a copy of the CBAs, neglected to advise him of the need to file an official grievance form, and arbitrarily dismissed his complaints in violation of its duty of fair representation. These allegations regarding the Union, however, do not appear in Soremekcun's first amended complaint. Having failed to include the allegations in his complaint, Soremekun cannot now convert the action into "a hybrid § 301/fair representation claim" by raising the argument for the first time in opposition to a summary judgment motion. See *id.* at 185

---

[36]See Briggs Decl., Exh. C at 47 (1999-2002 CBA, Art. 16.A. *("Any and all* matters of controversy, dispute or disagreement of any kind or character existing between the parties arising out of or in any way involving the interpretation and/or application of the terms of this Agreement shall be settled and resolved by the procedures and in the manner as set forth herein" (emphasis added)), Exh. D at 71 (2002-2005 CBA, Art. 16.1 (same)).

[37]*Id.,* Exh. B (Soremekun Depo. at 26:21-24, 28:15-29:4).

[38]*Id.,* Exh. C at 47-48 (1999-2002 CBA, Art. 16.B.4); Exh. D at 72-73 (2002-2005 CBA, Art. 16.2.3).

("We think that another situation when the employee may seek judicial enforcement of his contractual rights arises, if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, and if, *as is alleged here,* the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance" (emphasis added)); *Waldron v. Boeing Co.,* 388 F.3d 591, 594 (8th Cir. 2004) ("If an employee does not agree with the results reached through the procedures of the CBA, the employee, in order to bring an individual suit directly against the employer for breach of the CBA, must *allege and prove* the union breached its duty of fair representation" (emphasis added)); *Brown v. Witco Corp.,* 340 F.3d 209, 213 n. 5 (5th Cir. 2003) ("The employee must *allege and prove* both that the employer has breached the collective bargaining agreement and that the union has breached its duty of fair representation" (emphasis added)); *Bills v. United States Steel LLC,* 276 F.3d 785, 787 (8th Cir. 2001) ("The law is well settled that appellant's invocation of jurisdiction under 301(a) of the Labor Management Relations Act of 1947 required him to *allege and prove* that USWA breached its duty of fair representation, *Carter v. Ford Motor Co.,* 121 F.3d 1146, 1149 (8th Cir.1997). There this Court clearly states appellant's options if he decides to file suit because he does not agree with the results reached by the collective bargaining agreement. The employee must *allege and prove* the union breached its duty of fair representation" (emphasis added)); *McNealy v. Caterpillar, Inc.,* 139 F.3d 1113, 1124 (7th Cir. 1998) ("When an employee seeks to bring a § 301 suit against his employer, he must allege a hybrid cause of action — first a claim of breach of fair representation against the union and then a § 301 cause of action against the employer"); *Thomas v. Office and Professional Employees Int'l. Union, Local 2,* Nos. 91-7173, 91-7174, 1993 WL 460099 (D.C. Cir. Oct. 27, 1993) ("Thomas's amended complaint dropped all claims against the union and failed to allege that the union had breached its duty of fair representation. Although Thomas need not have sued the union, . . . she was required to '*allege,* and eventually show, inadequate representation' by the union," quoting *Samples v. Ryder Truck Lines, Inc.,* 755 F.2d 881, 887 n. 5 (11th Cir.1985) (emphasis added)); *United Food and Commercial Workers, Local Union No. 7R v. Safeway Stores, Inc.,* 889 F.2d 940, 944 (10th Cir. 1989) ("Ordinarily, an employee must allege a breach of the duty of fair representation in order to avoid dismissal of his or her section 301 suit for failure to

exhaust exclusive contractual remedies under the collective bargaining agreement").

Because the record clearly establishes that Soremekun failed to exhaust his contractual remedies, and no breach of the duty of fair representation is alleged in the complaint, Thrifty is entitled to summary judgment on Soremekun's § 301 claim.[39]

---

[39]Even if Soremekun had alleged the Union's breach of the duty of fair representation in his complaint, and had succeeded in raising a triable issue of fact regarding that claim, his § 301 claim would be barred by the statute of limitations. This is because hybrid § 301/fair representation claims are subject to the six-month statute of limitations set forth in section 10(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(b). See *DelCostello, supra,* 462 U.S. at 169-70 (holding, in an action by an employee against an employer for breach of a collective bargaining agreement, and against a union for breach of the duty of fair representation, that the six-month statute of limitations set forth in NLRA barred filing of the claim; ". . . [W]e have available a federal statute of limitations actually designed to accommodate a balance of interests very similar to that at stake here — a statute that is, in fact, an analogy to the present lawsuit more apt than any of the suggested state-law parallels. We refer to § 10(b) of the National Labor Relations Act, which establishes a six-month period for making charges of unfair labor practices to the NLRB. . . [D]uty-of-fair-representation claims are allegations of unfair, arbitrary, or discriminatory treatment of workers by unions — as are virtually all unfair labor practice charges made by workers against unions. Similarly, it may be the case that alleged violations by an employer of a collective bargaining agreement will also amount to unfair labor practices" (citations and footnotes omitted)); *Walls v. Int'l. Longshoremen's & Warehousemen's Union, Local 23,* 10 Fed. Appx. 485, 488 (9th Cir. May 11, 2001) (Unpub. Disp.) ("The district court did not err by applying the six-month statute of limitations set forth in section 10(b) of the National Labor Relations Act (NLRA), 29 U.S.C. § 160(d), to plaintiffs' duty of fair representation claim and hybrid § 301/duty of fair representation claim . . ."); *Truesdell v. So. Cal. Permanente Med. Group,* 151 F.Supp.2d 1161, 1169-70 (C.D. Cal. 2001) ("The parties agree that Plaintiff's claim(s) against the Medical Group and SEIU Local 399 are a 'hybrid' Section 301/breach of duty of fair representation claim. To support such a claim, Plaintiff must plead facts showing both that the employer breached the CBA and that the union breached its duty of fair representation to her.

## C. Whether Plaintiff's Remaining State Law Claim Is Barred

Thrifty next argues that Soremekun's remaining state law claim for violation of Labor Code §§ 202 and 203 is barred by the six-month statute of limitations set forth in the CBAs.[40] Soremekun counters that California Code of Civil Procedure § 337, which provides a four-year statute of limitations for unpaid wage claims premised on a written employment contract, governs.[41]

Under Labor Code § 202, "[i]f an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting." CAL. LAB. CODE § 202(a). Section 203 provides that "[i]f an employer willfully fails to pay, without abatement or reduction, in accordance with Section[ ] . . . 202, . . . any

---

Such a claim is subject to the same six month statute of limitations period which applies to unfair labor practice charges" (citations omitted)).

Soremekun's declaration shows that he was aware of the alleged wage discrepancies that form the basis of this action in 2001 and 2002. (See Soremekun Decl., ¶¶ 8-18.) Moreover, Soremekun admits that in February 2003, he filed a claim with the California Department of Labor Standards Enforcement for $50,976.99 in unpaid wages — approximately the same amount of damages he seeks in this action. (See Briggs Decl., Exh. F.) This fact confirms that Soremekun had knowledge of the alleged wage discrepancies well more than six months prior to filing suit in January 2004. Thus, even assuming that Soremekun had properly pleaded a hybrid § 301/fair representation claim, and raised a triable issue of fact concerning the union's alleged breach of its duty of fair representation, the disposition of this case would be the same.

[40]Def.'s Mot. at 6.

[41]Plaintiff Adediji A. Soremekun's Points and Authorities in Support of Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp.") at 8.

wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days." CAL. LAB. CODE § 203. These sections create "nonnegotiable state-law rights . . . independent of any right established by contract." *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 213 (1985); see CAL. LAB. CODE § 219 (no provision in the article, including sections 202 and 203, "can in any way be contravened or set aside by a private agreement, whether written, oral, or implied"); *id.*, § 222 ("It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either willfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon").

If a state law cannot be waived or modified by private contract, and if the rights it creates can be enforced without resort to the particular terms, express or implied, of the labor contract, the LMRA does not preempt a claim for violation of the law. *Miller v. AT&T Network Systems,* 850 F.2d 543, 545-46 (9th Cir. 1988). Stated otherwise, section 301 of the LMRA does not "grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. . . ." *Allis-Chalmers, supra,* 471 U.S. at 212; see also *Hayden v. Reickerd,* 957 F.2d 1506, 1509 (9th Cir. 1992). Consequently, cases distinguish between state laws that require interpretation of a labor contract and those that prohibit parties from including particular terms in such a contract. *Miller, supra,* 850 F.2d at 547. A provision in a collective bargaining agreement will not trigger preemption when it is only potentially relevant to the resolution of state law claims. See *Humble v. Boeing Co.,* 305 F.3d 1004, 1010 (9th Cir. 2002) ("First, we have held that a CBA provision does not trigger preemption when it is only potentially relevant to the state law claims, without any guarantee that interpretation or direct reliance on the CBA terms will occur"); see also *Cramer v. Con-*

*solidated Freightways, Inc.,* 255 F.3d 683, 691-92 (9th Cir. 2001) ("Moreover, alleging a hypothetical connection between the claim and the terms of the CBA is not enough to preempt the claim: adjudication of the claim must require interpretation of a provision of the CBA. A creative linkage between the subject matter of the claim and the wording of a CBA provision is insufficient; rather, the proffered interpretation argument must reach a reasonable level of credibility. . . . The argument does not become credible simply because the court may have to consult the CBA to evaluate it; 'look[ing] to' the CBA merely to discern that none of its terms is reasonably in dispute does not require preemption"). Thus, state law claims for unpaid wages are not preempted when the court is required simply to apply the terms of a CBA; they are preempted only when the court must interpret the provisions of the CBA. Compare *Balcorta v. Twentieth Century-Fox Film Corp.,* 208 F.3d 1102, 1109-10 (9th Cir. 2000) ("A court may be required to read and apply these provisions [of the CBA] in order to determine whether an employee was discharged from his 'call' at the end of his shift, but no interpretation of the provisions would be necessary") with *Firestone v. Southern California Gas Co.,* 219 F.3d 1063, 1067 (9th Cir. 2000) ("[I]f California law were to apply, the parties negotiating the agreement would not know whether the employer's overtime obligations were defined by the contract or not, depending on which rate a court determined was the 'regular' rate under the California law. The claim is preempted").

In its October 25, 2004 order denying Soremekun's motion to remand, the court held that his Labor Code claim was not preempted by the LMRA, stating:

"Under *Balcorta,* Soremekun's Labor Code § 202 claim is not preempted because the statute confers a right that is non-negotiable. More fundamentally, the court need not interpret the CBA to determine whether Soremekun received wages he was owed within 72 hours of resigning his employment with

Thrifty. See *id.* at 1108 ("In order to help preserve state authority in areas involving minimum labor standards, the Supreme Court has distinguished between claims that require interpretation or construction of a labor agreement and those that require a court simply to 'look at' the agreement"); *id.* ("We have stressed that, in the context of § 301 complete preemption, the term 'interpret' is defined narrowly — it means something more than 'consider,' 'refer to,' or 'apply' "). While the court will have to "look at" the CBA to determine what wages were owed, it will not have to interpret the agreement to determine if the amounts due were paid within 72 hours of Soremekun's resignation. See *id.* ("The measure of timeliness under § 201.5 could not be more plain: once an employee covered by the law is discharged, state law requires payment 'within 24 hours.' On its face, § 201.5 requires nothing more than a clock or a calendar to determine the timeliness of Fox's payment — the law does not require us even to refer to the collective bargaining agreement, let alone interpret it")."

See also *Livadas v. Bradshaw,* 512 U.S. 107, 124-25 (1994) (holding that a section 203 claim was not preempted because, while the district court might have to consult the collective bargaining agreement to determine what wages were due, "the primary text for deciding whether Livadas was entitled to a penalty was not the Food Store Contract, but a calendar," and "the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301").

Now, at the summary judgment stage, the court must look to the plain language of the CBAs to determine whether Soremekun was in fact owed any wages at the time of his resignation in 2003. Soremekun does not clearly identify the wages he contends were "due" in June 2003. It appears, how-

ever, that he asserts the overtime pay and bereavement leave wages that are the subject of his § 301 claim were not paid within 72 hours of his resignation. The CBAs provide that if an employee does not file a wage claim with the Union within a specified period — ten days after discovery under the 1999-2002 agreement and twenty-one days after discovery under the 2002-2005 agreement — the claim "shall be deemed null and void."**[42]** The CBAs further provide that "no wage or other direct compensation claim *not involving interpretation of the contract* can cause such Employer to pay such claim or any portion thereof retroactively for a period of more than six (6) months immediately prior to the date of the Employer's receipt of notice from the Union of the claim. In any event, the Employer's obligation to compensate an employee for unpaid time worked under Article 7-E, shall not be limited in any way by the foregoing, except for the six (6) month limitation."**[43]**

The parties do not dispute the meaning of these provisions, or the fact that there was no compliance with the grievance procedure in this case. There is thus no need to "interpret" these aspects of the CBAs in assessing whether there were wages "due" at the time of Soremekun's resignation. See *Livadas, supra,* 512 U.S. at 124 ("[W]e were clear that when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished," citing *Lingle, supra,* 486 U.S. at 413 n. 12). Similarly, there is no basis under the Labor Code for refusing to give effect to the provisions, since they do not "contravene[ ] or set aside" Soremekun's right to be compensated for any wages due within seventy-two hours of his resignation, or "withhold from [him] any part of the wage agreed upon." CAL. LAB. CODE §§ 219, 222. Rather, the

---

**[42]***Id.,* Exh. C at 47 (1999-2002 CBA, Art. 16.B.3), Exh. D at 72 (2002-2005 CBA, Art. 16.2.3).

**[43]***Id.* (emphasis added).

provisions require that wage disputes be resolved through the grievance procedures to which Rite Aid and the Union, on behalf of the employees, contractually agreed. The undisputed evidence shows that the grievance procedures set forth in the CBAs were not followed, and that Rite Aid did not receive contractual notice of Soremekun's wage claims as required. See *Hagin v. Pacific Gas & Elec. Co.,* 152 Cal.App.2d 93, 96-98 (1957) (holding that a discharged employee could not recover board and lodging expenses under Labor Code §§ 202 and 203 because he failed to submit a grievance as required by the collective bargaining agreement and establish that the monies were due); cf. *Lim v. Prudential Insurance Co. of America,* 36 Fed.Appx. 267, 271 (9th Cir. May 17, 2002) (Unpub. Disp.) (holding, in a case where an employee sued for wrongful termination in violation of public policy, and asserted that her employer discharged her to avoid paying earned commissions, that "[b]ecause Lim's claim is based on a violation of a fundamental state statutory policy that is inde-pendent of the CBA and because her claim is not based on a breach of the CBA, the district court erred in dismissing that claim on the ground that Lim failed to exhaust the CBA's grievance procedure," but noting that "the court hearing Lim's claim may be required to refer to the collective bargain-ing agreement in order to confirm that termination did indeed deprive Lim of earned commissions"). Like the plaintiff in *Hagin,* Soremekun cannot show that the bereavement leave pay and overtime wages he seeks to recover were "due" when he resigned in 2003 because he failed to submit grievances regarding those claims as required by the CBAs. Moreover, reference to the CBAs, as authorized by *Livadas* and *Lim,* shows that all of Soremekun's claims — which concern wages allegedly not paid between 1998 and April 2002[44] —

---

[44]See Soremekun Decl., ¶¶ 5, 8, 14, 15, 16. Soremekun was hired by Rite Aid on January 15, 1998, more than a year and a half before the July 5, 1999 effective date of the 1999-2002 CBA. (Def.'s Facts, ¶1; Pl.'s Facts, ¶1.) It is undisputed that Soremekun began complaining about wage discrepancies in 1998. (Def.'s Facts, ¶3; Pl.'s Facts, ¶3.) Because it appears that Soremekun was not covered under a collective bargaining

involve amounts that were no longer "due" in 2003 because more than six months had passed since the claims accrued. Soremekun has neither alleged nor adduced evidence that Thrifty failed to pay him wages due during the six months preceding his resignation in 2003. Based on the clear language of the CBAs, therefore, the court concludes that there were no past wages due to Soremekun at the time of his resignation. Accordingly, Thrifty is entitled to summary judgment on Soremekun's Labor Code §§ 202 and 203 claim.

---

agreement between January 15, 1998 and July 5, 1999, he was not required to exhaust grievance procedures to preserve wage claims that arose during that time. Those claims are therefore governed by the four-year statute of limitations set forth in Code of Civil Procedure § 337(1). CAL. CIV. PROC. CODE § 337(1); see *Cuadra v. Milan,* 17 Cal.4th 855, 859 (1988) ("The general statutes of limitations set out in the Code of Civil Procedure govern the time in which an employee may commence a civil action for unpaid wages. Thus if the action is based on a written contract of employment it must be commenced within four years after the cause of action has accrued," citing CAL. CIV. PROC. CODE § 337(1)). As the court in *Cuadra* explained: "A cause of action for unpaid wages *accrues* when the wages first become legally due, i.e., on the regular payday for the pay period in which the employee performed the work; when the work is continuing and the employee is therefore paid periodically (e.g., weekly or monthly) a separate and distinct cause of action accrues on each payday, triggering on each occasion the running of a new period of limitations. And for statute of limitations purposes an action for unpaid wages is deemed to have commenced, like all civil actions, on the date on which the employee files the complaint. It follows that such an action is timely as to all paydays falling within the relevant limitations period. For the same reason, in calculating the amount of unpaid wages due in such an action the court will count back from the filing of the complaint to the beginning of the limitations period . . . . and will award all unpaid wages earned during that period." *Id.* (citations omitted, emphasis in original). This action commenced on January 15, 2004, when Soremekun filed his complaint in state court. See CAL. CIV. PROC. CODE § 350. Therefore, any claims that accrued between January 15, 1998 and July 5, 1999 are barred by the four-year statute of limitations set forth in Code of Civil Procedure § 337.

## III.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2007 Thomson/West.