**LIBERTY INSURANCE UNDERWRITERS, INC., Plaintiff,**

v.

**DAVIES LEMMIS RAPHAELY LAW CORPORATION, M. Randel Davies, Rosemary Lemmis, and Shabab Raphaely, Defendants.**

**Case No. CV 15–859 DMG (JCx)**

United States District Court, C.D. California.

Signed February 23, 2016

Matthew M. Burke, Ropes and Gray LLP, Boston, MA, Bryan M. Weiss, Murchison and Cumming LLP, San Francisco, CA, for Plaintiff.

Mark Steven Reusch, John A. Marshall, Goshgarian & Marshall PLC, Calabasas, CA, for Defendants.

1. The Court sets forth the material facts, which are uncontroverted except where indicated. The Court responds to objections to

## ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
### [43]

DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

### I.

### PROCEDURAL BACKGROUND

On February 6, 2015, Plaintiff Liberty Insurance Underwriters, Inc. ("Liberty") filed a complaint against Defendants Davies Lemmis Raphaely Law Corporation ("DLR"), M. Randel Davies, Rosemary Lemmis, and Shahab Raphaely requesting a declaratory judgment that seven pending civil lawsuits ("the Underlying Actions") alleging that Defendants participated in a fraudulent investment scheme should be considered a single claim for purposes of the per-claim limit contained in Liberty's insurance policy. [Doc. # 1.]

On December 29, 2015, Liberty filed a motion for summary judgment ("MSJ") on the grounds that all of the Underlying Actions allege, are based upon, arise out of or are attributable to the same or related wrongful acts, and that Defendants have therefore exhausted the per-claim limit of liability under the 2010–2011 insurance policy issued by Liberty. [Doc. # 43.] On January 22, 2016, Defendants filed an opposition ("Opp."). [Doc. # 44.] On February 5, 2016, Liberty filed a reply ("Reply"). [Doc. # 57.]

A hearing on the matter took place on February 19, 2016.

### II.

### FACTUAL BACKGROUND [1]

#### A. The Parties

Liberty is an insurance company which issues professional liability policies. (De-

evidence only where such evidence is relied upon in the Court's ruling.

fendants' Statement of Genuine Disputes of Material Facts and Additional Material Facts ("SGDMF") ¶¶ 1–3 [Doc. # 45].)

DLR is a transactional real estate firm, and M. Randel Davies, Rosemary Lemmis, and Shahab Raphaely are transactional real estate attorneys who represent clients involved in purchasing, selling, transferring, and/or syndicating ownership, leasing, and financing of commercial properties. (Respond of Liberty Insurance Underwriters, Inc. to DLR's Statement of Disputed Facts ("Resp.SGDMF") ¶ 1 [Doc. # 59].) DLR and its attorneys serve as counsel to Asset Management Consultants, Inc., a licensed California real estate broker which facilitates real estate investment partnerships, and its principal, James Hopper (collectively "AMC"). (Resp. SGDMF ¶¶ 6–7.)

## B. The Policies

Liberty issued three successive professional liability policies to DLR for the periods of August 1, 2010 through August 1, 2011 ("2010–2011 Policy"), August 1, 2011 through August 1, 2012 ("2011–2012 Policy"), and August 1, 2012 through August 1, 2013 ("2012–2013 Policy"). (SGDMF ¶¶ 1–3.) All three policies (collectively, "the Policies") are "claims-made-and-reported" policies. (Id. ¶ 4.) The Policies have a limit of liability of $1,000,000 per claim and $2,000,000 in the aggregate. (Id. ¶ 5.) Each Defendant is an insured under the Policies. (Id. ¶ 13.)

Each of the Policies states in pertinent part:

We agree to pay on your behalf all damages in excess of the deductible amount and up to the limits of liability stated in the Declarations that you become legally obligated to pay, provided such damages:

1. result from claims

a. first made against you during the policy period or any extended reporting period, if applicable, and reported to is in writing; and

2. are caused by a wrongful act which takes place before or during the policy period but not before the Retroactive Date set forth in the Declarations, if any.

(Id. ¶ 6.) Each of the Policies defines "wrongful act" as "any actual or alleged act, error, omission or personal injury which arises out of the rendering or failure to render professional legal services." (Id. ¶ 11.)

Each of the Policies defines "claim" as "a demand received by you for money or services, including the service of suit or institution of arbitration proceedings against you, or a disciplinary proceeding." (Id. ¶ 7.) Each of the Policies defines "claim expenses" to include "reasonable and necessary fees charged by any lawyer designated by us" and "all reasonable and necessary fees and expenses charged by any lawyer selected by you as independent counsel." (Id. ¶ 8.) Each of the Policies provides: "[c]laim expenses reduce this policy's limits of liability and claim expenses apply to this policy's deductible. However, subject to specific conditions and limitations, a certain amount of claim expenses do not apply to the limits of liability or to the deductible as fully described in the Special Benefits section of the policy." (Id. ¶ 9.) According to the "Special Benefits" section of the Policies, the first $250,000 of claim expenses incurred during the policy period does not apply to the limits of liability. (Id. ¶ 10.)

With regard to multiple claims, the Policies state: "Claims alleging, based upon, arising out of or attributable to the same or related wrongful acts shall be treated as a single claim regardless of whether made against one or more than one of you. All such claims, whenever made, shall be considered first made during the policy period or any extended reporting period in which

the earliest claim arising out of such wrongful acts was first made, and all such claims shall be subject to the same limits of liability." (*Id.* ¶ 12.)[2] Under the Policies, Liberty has the right and duty to defend any claim. (*Id.* ¶ 14.)

## C. The Underlying Actions

AMC handles investment partnership deals for both Tenant–in–Common ("TIC") Investors and Limited Partnership ("LP") Investors. (Resp. SGDMF ¶¶ 13, 18–19.) Prior to 2002, most AMC investors were LP Investors. (*Id.* ¶ 18.) In 2002, the Internal Revenue Service ("IRS") issued a new Revenue Procedure providing guidance for the structuring of TIC ownership interests that would satisfy the requirements of Internal Revenue Code ("IRC") section 1031 and not be characterized as disallowed partnership investments. (*Id.* ¶ 130.) Accordingly, in or about 2002, AMC began to offer investors a new type

of TIC investment which would allow them to reinvest their sale proceeds with AMC in an IRC section 1031 "like-kind exchange" between sale of one asset and acquisition of another without incurring capital gains tax liability on the sale of the first asset. (*Id.* ¶¶ 17–19.) Many of the actions at issue in this case relate to these new types of TIC Investments and IRC section 1301 "like-kind exchanges" between LP Investments and TIC Investments intended to defer capital gains taxes. (*Id.*)

Between 2011 and 2013, seven cases were filed against Defendants and AMC related to 23 AMC transactions which occurred between December 2003 and November 2009. (*Id.* ¶¶ 20–21.) These actions are referred as the Amlap Action, the Ahern Action, the McCready Action, the Kornievsky Action, the Stella Action, the Kipnis Action, and the Barrons Action (collectively, the "Underlying Actions").[3] Fif-

---

**2.** Defendants contend that "Plaintiff['] s Statement of Fact No. 12 does not set forth the exact language of the policy regarding the Multiple Insureds, Claims and Claimants as set forth in Paragraph 6, under the Limits of Liability & Deductible section of the policies." (SGDMF ¶ 12.) The Court finds that Plaintiff has accurately quoted the relevant language from the Policies, and Defendant's objection is overruled. *See* Burke Decl. Exs. 3–5, at p. 7 of 14.

**3.** The Underlying Actions consist of:

*Amlap ST, LLC et al. v. Asset Management Consultants Inc., et al.,* Case No. BC459858, filed in Los Angeles County Superior Court on or about April 18, 2011 ("Amlap Action"). (Burke Decl., Ex. 6.) The *Amlap* Plaintiffs filed a fifth amended complaint on or about July 23, 2012. (SGDMF ¶ 16.) DLR tendered the complaint in the Amlap action to Liberty on or before June 28, 2011. (*Id.* ¶ 18.)

*Priscilla Ahern, et al. v. Basso, et al.,* Case No. BC484356, filed in Los Angeles Superior Court filed on or about May 10, 2012 ("Ahern Action"). (Burke Decl., Ex. 9.) The *Ahern* Plaintiffs filed a first amended complaint on or about March 13, 2013. (SGDMF ¶ 20.)

DLR tendered the complaint in the Ahern Action to Liberty on or before June 8, 2012. (*Id.* ¶ 22.)

*William McCready, et al. v. Smith Linden & Basso, LLP, et al.,* Case No. 30–2013–00632262, filed in Orange County Superior Court on or about February 21, 2013 ("McCready Action"). (Burke Decl., Ex. 11.) The *McCready* Plaintiffs filed a third amended complaint on or about January 13, 2014. (SGDMF ¶ 24). DLR tendered the complaint in the McCready Action to Liberty on March 19, 2013. (*Id.* ¶ 26.)

*George M. Kornievsky, et al. v. Smith Linden & Basso, LLP, et al.,* Case No. 30–2013–00635667–CU–PN–CJC, filed in Orange County Superior Court n or about March 7, 2013 ("Kornievsky Action"). (Burke Decl., Ex. 13.) The *Kornievsky* Plaintiffs filed a third amended complaint on or about January 13, 2014. (SGDMF ¶ 28.) DLR tendered the complaint in the Kornievsky Action to Liberty on March 19, 2013. (*Id.* ¶ 30.)

*Michael Stella v. Hamilton Venture, L.P., et al.,* Case No. BC508056, filed in Los Angeles County Superior Court on or about May 6, 2013 ("Stella Action"). (Burke Decl., Ex. 16.)

teen of the 23 transactions included both TIC Investors and LP Investors, while the remaining eight transactions involved only LP Investors. (*Id.* ¶ 22.)

Each of the seven Underlying Actions involve a similar alleged scheme, which is that, in the course of negotiating a property acquisition transaction, the defendants made a false representation to plaintiff-investors that the sellers would pay all commissions relating to the transaction, when in reality the purchase price of the property was marked up to include a commission payment. (SGDMF ¶¶ 43–45.) The plaintiffs in the Underlying Actions allege that they relied upon these misrepresentations in choosing to invest. (Wrongful Acts Chart ¶ 2.[4]) All of the Underlying Actions allege that DLR and its attorneys participated in the drafting of the offering memoranda and other documents relating to the proposed investment and had knowledge of the alleged misrepresentations and materials omissions but failed to disclose them. (*Id.* ¶ 4.) With the exception of the Stella Action, each of the plaintiffs in the Underlying Actions allege that they had an attorney-client relationship with DLR, and that DLR failed to properly disclose actual or potential con-

The *Stella* Plaintiff filed a first amended complaint on or about April 17, 2015. (SGDMF ¶ 32.) DLR tendered the complaint in the Stella Action to Liberty on February 21, 2014. (*Id.* ¶ 34.)

*Sharon Kipnis, et al. v. Smith Linden & Basso, LLP, et al.*, Case No. 30–2013–00648235, filed in Orange County Superior Court on or about May 7, 2013 ("Kipnis Action"). (Burke Decl., Ex. 18.) The *Kipnis* Plaintiffs filed a first amended complaint on or about January 13, 2014. (SGDMF ¶ 36.) DLR tendered the complaint in the Kipnis Action to Liberty on or before July 8, 2013. (*Id.* ¶ 38.)

*James Glenn Barrons, et al. v. Smith Linden & Basso, LLP, et al.*, Case No. 30–2013–00648240, filed in Orange County Superior Court on or about May 7, 2013 ("Barrons Action"). (Burke Decl., Ex. 19.) The *Barrons* plaintiffs filed a second amended complaint on or about January 13, 2014. (SGDMF ¶ 40.) DLR tendered the complaint in the Barrons Action to Liberty on or before July 8, 2013. (*Id.* ¶ 42.)

4. Plaintiff has created two relevant charts for ease of reference: a Summary of Underlying Actions ("Underlying Actions Chart") (Burke Decl. Ex. 2) [Doc. # 43–3] and a Comparison of Alleged Wrongful Acts in Underlying Actions ("Wrongful Acts Chart") (Burke Decl., Ex. 1) [Doc. # 43–2]. (MSJ at 5, n. 3–4.) Defendants object to these charts as improper summary evidence pursuant to Fed.R.Evid. 1006 and a violation of the Best Evidence Rule pursuant to Fed.R.Evid. 1002. (SGDMF ¶¶ 4353.) Defendants contend that Plaintiff "has failed to accurately set forth a complete, accurate[,] and non-prejudicial summary document[.]" (*Id.*)

Under Rule 1006, a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed.R.Evid. 1006. The complaints relied upon in preparing these charts are publicly available documents and Defendants are parties to each of the actions in question. Plaintiff has also attached the complaints as exhibits. (Burke Decl., Ex. 7 (Amlap Complaint); Ex. 9 (Ahern Complaint); Ex. 11 (McCready Complaint); Ex. 13 (Kornievsky Complaint); Ex. 16 (Stella Complaint); Ex. 18 (Kipnis Complaint); Ex. 19 (Barrons Complaint).) Defendants' blanket objections to the charts will be disregarded unless more specific objections to their accuracy are raised.

Moreover, it is well settled that, at the summary judgment stage, courts· focus on the admissibility of the *contents* of evidence, not its *form. See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir.2001)). The underlying contents of the charts, namely the complaints in the Underlying Actions, which are publicly available court documents, would be admissible at trial. The Court will therefore consider these charts, in addition to Defendants' proffered

flicts or properly represent the interests of the plaintiff-clients. (SGDMF ¶¶ 49–50). All of the Underlying Actions include causes of action for intentional and/or negligent misrepresentation, fraud by concealment and/or constructive fraud, and violations of California's unfair competition law ("UCL"). (Underlying Actions Chart.) Six of the seven Underlying Actions include legal malpractice and breach of fiduciary duty. (*Id.*)

The allegations in the Underlying Actions involve a variety of property sales and acquisitions, related to both TIC and LP Investments, some of which involve the same properties. The allegations in the Amlap Action involve a single TIC investment in the Amlap Property.[5] (*Id.* ¶ 89.) The Ahern/Stella Action—originally a class action—involves an investment in the Robertson and Aerovault Transactions, and relates to both TIC and LP Investments.[6] (*Id.* ¶ 58.) The second Stella Class Action involves LP investments in eight additional properties: Hamilton, Baker, Overland, Winaldi, Capom, Arbor, Packard, and Todd Lane. (*Id.* ¶ 119.) The McCready Action alleges that the plaintiff was wrongfully induced to sell the Robertson Property and reinvest in the Amlap and Aerovault Properties, and that McCready subsequently made a TIC Investment in the Amlap Property and several LP Investments in the Overland, Fiesta, and Packard Properties. (*Id.* ¶¶ 66–67, 108.) The Kornievsky Action alleges that the plaintiff was wrongly induced into investing in 15 different TIC Investments.[7] (*Id.* ¶ 69.) The Kipnis Action alleges that the plaintiffs were induced to invest in two TIC Investments in the Aerovault and Eaton Properties, as well as several LP Investments in the Hamilton, Baker, Overland, Winaldi, Capom, Arbor, Packard, and Todd Lane properties. (*Id.* ¶¶ 72, 121.) The Barrons Action alleges that the plaintiffs were induced to sell the Robertson property and invest the money from the sale of the Robertson Property into TIC Investments in the Aerovault and Eaton properties, and several LP Investments in the Capom, Arbor Square, and Packard Venture properties. (*Id.* ¶ 73; Barrons Complaint ¶ 163.)

Each property acquisition at issue was completed on a different date, purchased from a separate seller, and on different terms from each other acquisition. (*Id.* ¶ 24.) The purchase agreements were negotiated at different times with 21 different sellers represented by 21 different law firms. (*Id.* ¶ 26.)

**D. Legal Representation in the Underlying Actions**

In 2011, Liberty appointed Michael Wilk of Lewis, Brisbois, Bisgaard, & Smith, LLP ("Lewis Brisbois") as defense counsel in the Underlying Actions, and advised DLR of this appointment. (SGDMF ¶ 58.) Wilk submitted fees and costs incurred in the course of this representation to both DLR and Liberty, and Liberty duly reviewed and paid them. (*Id.* ¶¶ 59–60.)

---

evidence, regarding the substance of the Underlying Actions.

5. The Amlap Complaint refers to this property as the La Palma Property. (Amlap Complaint ¶ 55.)

6. Plaintiff contends that the Ahern Action also includes the Amlap, Eaton/Bradley, La Baya, La Palma, Margick, and Mesa Ranch Plaza properties. (Underlying Action Chart.)

7. The properties involved in the Kornievsky claims are: Aerovault, Baker, Eaton/Bradley, Fairgrounds, Fiesta, Figueroa, Hamilton, Hawaii, La Baya, La Palma, Maway, Moreno Valley, Prairie, UTC, and South Robertson. (Underlying Actions Chart.) Defendants contend that the Kornievsky allegations are particularly different from the allegations in the other cases, because they take place over a six-year period from 2003 to 2009. (Resp. SGDMF ¶ 114.)

In June 2012, DLR requested that John Marshall of Goshgarian & Marshall, PLC ("Goshgarian") act as independent defense counsel in the Underlying Actions. (SGDMF ¶ 61.) Marshall submitted invoices for fees and costs incurred in the defense of these actions to Liberty, with a copy to DLR. (*Id.* ¶ 62.)

Liberty Senior Claims Specialist Dorothy Watkins states in her declaration that Liberty has paid the fees and costs submitted by both Lewis Brisbois and Goshgarian in connection with the Underlying Actions, and has attached a list of these expenses. (Declaration of Dorothy Watkins in Support of Plaintiff's Motion for Summary Judgment ("Watkins Decl.") ¶ 7, Ex. 1 [Doc. # 43–35].) [8] The expenses listed total $1,270,470.08 in legal fees and costs to Goshgarian & Marshall and Lewis Brisbois. (*Id.*)

Defendants dispute whether all the Goshgarian invoices have been paid, asserting that "they are entitled to still be reimbursed by [Liberty] for Goshgarian & Marshall's invoices which [Liberty] has refused to pay based on [Liberty's] position that the Underlying Actions constitute one claim and that Defendants have exhausted the limits of the policy." (SGDMF ¶ 64.) In his declaration, Davies states that "[a]s a result of [Liberty's] position, DLR's policy has been charged for the duplicate services of two law firms to defend the cases." (Declaration of M. Randel Davies in Support of Opposition to LIUI's Motion for Summary Judgment ("Davies Decl.") ¶ 48 [Doc # 52].)

The parties dispute whether all of the fees and costs incurred by Wilk were for the benefit and defense of DLR and its attorneys, as Defendants contend that some of Wilk's fees and costs were for Liberty's benefit. (*Id.* ¶ 59.; *see also* Davies Decl. ¶ 48 ("The Lewis Brisbois fees should not be charged to the policy limits because after the retention of Goshgarian & Marshall, Lewis Brisbois' services were provided for the benefit of [Liberty]. In addition, a considerable amount [of] time was invested by both firms in preparing reports for the benefit of [Liberty] that added nothing to the defense.").)

### F.   Status of the Underlying Actions

Five of the underlying actions—Korrievsky, McCready, Barons, Amlap, and Ahern—have been consolidated and are being heard in a single JAMS arbitration before a neutral mediator. (Burke Decl., Ex. 22.) The Kipnis Action was dismissed by plaintiffs in March 2014 (Burke Decl., Ex. 23), and the Stella Action is the subject of a judicial reference before another third party neutral (Burke Decl., Ex. 26).

In the consolidated arbitration, DLR and its attorneys have moved to dismiss ("JAMS MTD") on the basis that the claims are barred by the applicable statutes of limitation, contain no factual allegations to support any of the claims for relief, and are barred by collateral estoppel. (Burke Decl. Ex. 24.)

In this motion to dismiss, DLR states:

Barrons and other investors ... filed a total of seven (7) lawsuits against the Davies' Defendants. *Many of the cases contain identical claims involving similar properties,* only with the plaintiffs'

---

8.   Defendants object to the portions of the Watkins Declaration which state that the invoices and fees submitted by Wilks were "incurred in the defense of Davies Lemmis and its attorneys" and that these expenses are "claim expenses." (Objections to Declaration of Dorothy Watkins Submitted in Support of

Plaintiff Liberty Insurance Underwriters, Inc.'s Motion for Summary judgment ("Obj. Watkins Decl.") at ¶¶ 1–2 [Doc. # 49].) Whether or not these expenses should be considered "claim expenses" remains at issue in this matter.

names being changed.... The Davies Defendants were served with a series of complaints by different plaintiffs, commencing in 2011, each of which were brought by the same lawyer and based on the same legal theories.... [S]ome of the other plaintiffs in the other related actions also own (or owned) interest in the Aerovault and Eaton properties, and the limited partnerships in which Barrons is invested are named as defendants in the Stella Class Action. *The Ahern/Stella complaint contained essentially the same allegations and legal theories as are contained in Barrons' Claim.*

(JAMS MTD at 11–13) (emphasis added) (internal footnotes omitted). This motion is currently pending.

In the Stella action, DLR and its attorneys filed a demurrer ("Stella Demurrer"), seeking dismissal of all claims against them on the basis that they are barred by the application statutes of limitation, fail to state a claim, and are barred by collateral estoppel. (Burke Decl., Ex. 26.)

In this demurrer, DLR states as follows:

b. *The Claims in the Related Actions are Virtually Identical to the Claims in the Instant Action*

Stella, in this lawsuit, alleges nearly identical theories of misconduct against Davies Defendants and numerous other defendants as are alleged in the Related Actions. Of the eight transactions involved in this lawsuit, six are also involved in the Related Actions. The complaints in the Related Actions contain nearly identical allegations as those made by Stella in this action. They allege that the respective PPM's misrepresented the commission and the "actual purchase price of the real property[."] There are numerous other virtually identical allegations in the complaints of the Related Actions as well as the Complaint in this matter.

(Stella Demurrer at 15.) In a Statement of Decision dated August 23, 2015, the JAMS Referee sustained the demurrer, holding that all of the claims were time barred. (*Id.*)

## III.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *accord Wash. Mut. Inc. v. United States,* 636 F.3d 1207, 1216 (9th Cir.2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris,* 682 F.3d 1144, 1147 (9th Cir.2012) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c), (e)); *see also Norse v. City of Santa Cruz,* 629 F.3d 966, 973 (9th Cir.2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial."). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless,*

*Inc.*, 509 F.3d 978, 984 (9th Cir.2007). "Rather, it draws all inferences in the light most favorable to the nonmoving party." *Id.*

## IV.

## DISCUSSION

At issue in this case is whether the Underlying Actions should be considered a single claim for purposes of the 2010–2011 Policy's per-claim limit. Pursuant to the Policy, "[c]laims alleging, based upon, arising out of or attributable to the same or related wrongful acts shall be treated as a single claim[.]" (2010–2011 Policy at 7 of 14, ¶ 6.) The Policy defines a "wrongful act" as "any actual or alleged act, error, omission or personal injury which arises out of the rendering or failure to render professional legal services." (*Id.* at 3 of 14, ¶ 15.) Because the Underlying Actions arise out of 23 distinct transactions which occurred between 2003 and 2009, they are not based on the "same" wrongful act. The question therefore becomes whether the underlying alleged wrongful acts are sufficiently "related" that the Underlying Actions should be treated as a single claim.

### A. "Related" Wrongful Acts

Various California courts have interpreted similar or identical clauses regarding when wrongful acts may be considered "related" in the context of multiple claims. In the leading California case, *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, the California Supreme Court held that "the term 'related' ... encompasses both logical and causal connections." 5 Cal.4th 854, 873, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993). The court held that, as used in a professional liability insurance policy, "related" was neither an ambiguous term nor limited only to causally related acts. *Id.* "[T]he rule requiring insurance policies to be construed against the party who chose the language [does

not require] such a drastic restriction of the natural scope of the definition of the word 'related' to mean only a causal connection." *Id.* at 872, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (internal citation, quotation marks, and brackets omitted). The fact that the term "related" was not defined in the policy did not render it inherently ambiguous. *Id.* at 866, 21 Cal.Rptr.2d 691, 855 P.2d 1263 ("The absence from the policy of a definition of the term 'related' does not *by itself* render the term ambiguous.") (emphasis in original).

In order to be causally related, the initial error or wrongful act must "cause" the additional wrongdoing. *See id.* at 868, 21 Cal.Rptr.2d 691, 855 P.2d 1263 ("If an attorney's error causes one or more other errors, the result is a chain of causation that leads to *an* injury, that is, a single claim.") "Even though there have been multiple causative acts, there will be a single 'occurrence' if the acts are causally related to each other as well as to the final result." *Id.* at 869, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (internal citation, quotation marks, and brackets omitted). The *Bay Cities* court did not elaborate on the test for a "logical" relationship between acts of wrongdoing, noting only that it did not intend to suggest that "the term 'related' would encompass every conceivable logical relationship." *Id.* at 873, 21 Cal. Rptr.2d 691, 855 P.2d 1263. "At some point, a relationship between two claims, though perhaps 'logical,' might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim under the policy." *Id.*

Other California courts have found multiple claims to be sufficiently related where the underlying actions are in service of a "single plan." In *McWethy v. California Ins. Guarantee Ass'n*, an attorney hired to prepare a client's will and trusts fraudu-

lently made himself beneficiary and trustee of the trust, and distributed large amounts of stock to himself and his daughter after the client's death. No. G035992, 2006 WL 1793640, at *1 (Cal.Ct.App. June 30, 2006), *as modified on denial of reh'g* (July 26, 2006). The court found that separate allegations relating to (1) exercising undue influence on the client before his death and (2) fraudulent receipt and sale of the stocks should be treated as a single claim. *Id.* at *6. The wrongful acts were considered "both logically and causally related to each other as part of a single plan to obtain ... a large share of [the estate]." *Id.* The court noted that that all injuries ultimately arose from defendant's violations of his fiduciary duty to the single deceased client. *Id.*

In *Flowers v. Camico Mutual Insurance Company,* the California Court of Appeal addressed a malpractice case in which an accounting firm failed to protect and guard against an embezzlement scheme perpetrated by its Chief Financial Officer ("CFO"). *Flowers v. Camico Mut. Ins. Co.,* No. A134890, 2013 WL 2571271, at *2 (Cal. Ct.App. June 12, 2013). The *Flowers* court found that, in spite of alleging more than one claim, the underlying action should be treated as a single claim for purposes of the per-claim limit of liability under a professional liability insurance policy. *Id.* The court found that the firm's acts, errors, and omission were "related", reasoning that "in every instance, the allegations against the Firm remain[ed] the same, that is, the Firm repeatedly failed to detect and guard against Hillyer's embezzlement scheme, which resulted in the same injury to the plaintiffs, namely, the loss of their funds." *Id.* at *4. The court stated that it was "critical to note that while there were multiple plaintiffs, as to the Firm there was essentially one client only." *Id.* ("As noted above, all the corporate entity plaintiffs were owned by the

Flowers, and the Flowers themselves were the only individual plaintiffs.")

In both *Flowers* and *McWethy,* there was essentially a single plaintiff who had suffered the same injury as a result of the multiple wrongful acts. The Ninth Circuit, however, has upheld a finding that two claims were sufficiently related even where "the suits were filed by two different sets of plaintiffs in two different fora under two different legal theories" because "the common basis for those suits was the [defendant's] business practice of permitting independent dealers to mark up [defendant's] loans." *WFS Fin., Inc. v. Progressive Cas. Ins. Co.,* 232 Fed.Appx. 624, 625 (9th Cir.2007). The court found that "[t]he harms alleged in the two class action suits [were] causally related and [did] not present such an 'attenuated or unusual' relationship that a reasonable insured would not have expected the claims to be treated as a single claim under the policy." *Id.* Similarly, a court in this district has found underlying actions from multiple plaintiffs to be related where the allegations were based on defendant-company's consistent policy of recklessly issuing high-risk mortgages. *XL Specialty Ins. Co. v. Perry,* No. CV 11–02078–RGK JCGx, 2012 WL 3095331, at *8 (C.D.Cal. June 27, 2012).

In contrast, in *Financial Management Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.,* the Ninth Circuit found that fraudulent misrepresentation claims brought by "unrelated investors, with unique investment objectives [who] were advised at separate meetings on separate dates, according to their unique financial positions" were not sufficiently related as to constitute a single claim. 506 F.3d 922, 925 (9th Cir.2007). The court noted that the district court incorrectly "focused solely on the allegations ... relating to the investment vehicle common to both inves-

tors." *Id.* The court emphasized that the plaintiffs had ultimately been presented with and invested in different funds, and "[m]ore importantly, some of the Wrongful Acts alleged by the two clients were different." *Id.* The underlying actions were insufficiently related where one plaintiff's claims were based primarily on "various omissions and oral misrepresentations made in connection with many different investment vehicles," while another's "relie[d] heavily on affirmative misrepresentations in written materials" and the "breach of a written agreement." *Id.* at 926. The court noted that multiple claims are not necessarily logically related "whenever two parties are advised to invest in the same fund" or "simply because both claimants blame the same financial advisor." *Id.*

Courts in other jurisdictions have held that "[c]laims may be related even if they allege different types of causes of action and arise from different acts" where there is "a 'single course of conduct' that serves as the basis for the various causes of action." *In re DBSI, Inc.,* No. 08–12687 PJW, 2011 WL 3022177, at *4 (Bankr. D.Del. July 22, 2011); *see also Kilcher v. Cont'l Cas. Co.,* 747 F.3d 983, 989 (8th Cir.2014) ("a court may consider several factors in concluding whether dishonest acts are part of a 'series of related acts,' including whether the acts are connected by time, place, opportunity, pattern, and, most importantly, method or modus operandi.") (internal citation and quotation marks omitted). Similarly, the Eleventh Circuit has held that multiple claims are related where the wrongful acts involve a "single course of conduct" "aimed at a single particular goal." *Cont'l Cas. Co. v. Wendt,* 205 F.3d 1258, 1264 (11th Cir. 2000). In *Gregory v. Home Ins. Co.,* the Seventh Circuit upheld the district court's finding that that claims could be considered related where they "involved legal advice and drafting of three documents all of which flowed from [defendant] structur-ing the deal to try to achieve certain tax and security consequences." 876 F.2d 602, 605 (7th Cir.1989).

■ In this case, while the Underlying Actions have been brought by different plaintiffs, they all arise from a single course of conduct, a unified policy of making alleged affirmative misrepresentations to investors in order to induce them to invest in commercial real estate acquisitions facilitated by AMC. *See Wendt,* 205 F.3d at 1264 ("The fact that these acts resulted in a number of different harms to different persons, who may have different types of causes of action ... does not render the 'wrongful acts' themselves to be 'unrelated' for the purposes of the insurance contract [where they] comprised a single course of conduct designed to promote investment in [the firm].")

The Underlying Actions all allege the same misrepresentations and omissions by Defendants in the same form relating to similar or identical investments and properties. In deciding to invest in AMC's commercial property transactions, the plaintiffs in the Underlying Actions all uniformly relied on written memoranda and other documents prepared by DLR which contained alleged misleading statements and omissions regarding inflated purchase prices and hidden commissions. *Cf. Financial Management Advisors,* 506 F.3d at 925 (one claimant's allegations relied on oral misrepresentations and omissions regarding a variety of investment vehicles, while the other's allegations relied on the breach of a written agreement to prioritize claimant's investment in a lower-risk "tranche" of a particular fund). The allegations all relate to either TIC or LP Investments in similar or identical properties, and are largely bound up with the IRC section 1031 like-kind exchanges designed to avoid capital gains taxes. *See Kilcher,* 747 F.3d at 989 (dishonest acts

with similar methods and "modus operandi" more likely to be part of a "series of related acts").

This case is distinguishable from *Financial Management Advisors*, which involved allegations of different types of wrongdoing related to different types of investments. 506 F.3d at 925. The main connection between the two claims was that they involved the same financial advisor who had advised two clients to invest in at least one of the same funds. *Id.* In contrast, the present case involves allegations of similar or identical acts of wrongdoing which were part of a general course of conduct aimed at the same goal of inducing investors to participate in transactions related to section 1031 like-kind exchanges.

The Underlying Actions are all ultimately based on the same alleged uniform policies and/or reckless actions of DLR and AMC. *See WFS*, 232 Fed.Appx. at 625 (suits filed by different groups of plaintiffs under different legal theories sufficiently related where the common basis for the suits was defendant's consistent business practice of permitting its agents to inflate the price of loans); *XL Specialty*, 2012 WL 3095331, at *8 (claims sufficiently related where allegations based on defendant's consistent policy of issuing high-risk mortgages).

Defendants' contention that a reasonable insured would not have expected the Underlying Actions to be treated as a single claim under the policy is unavailing. The relationship between the claims is not so "attenuated or unusual" that it should come as a shock to Defendants to discover that they are related. *Bay Cities*, 5 Cal.4th at 873, 21 Cal.Rptr.2d 691, 855 P.2d 1263. Defendants' own court filings indicate that they themselves consider the claims in these cases to be "virtually identical" (Stella Demurrer at 15) and to "contain identical claims involving similar properties" (JAMS MTD at 11).

The out-of-jurisdiction cases cited by Defendants regarding the distinct and separate duties of attorneys to different clients in malpractices cases are inapposite because they apply a standard different from that adopted in California and the Ninth Circuit. In *Scott v. Am. Nat. Fire Ins. Co.*, the Northern District of Ohio articulated a test for attorney malpractice claims that "if the attorney's duties are distinct and separate, or the actions result in distinct harms, then the actions in breaching those duties give rise to separate malpractice claims." 216 F.Supp.2d 689, 694 (N.D.Ohio 2002). The *Scott* court specifically distinguished this test from the causal-or-logical connection approach adopted by the California Supreme Court in *Bay Cities*. *Id.*

Similarly, in *Beale v. Am. Nat. Lawyers Ins. Reciprocal*, the Maryland Court of Appeal adopted the "distinct and separate duty" test. 379 Md. 643, 666, 843 A.2d 78, 92 (2004). The *Beale* court distinguished *Gregory* and *Wendt* by noting that, in those cases, "the attorney was engaged in a course of conduct designed to encourage investment in his client or his client's notes." *Id. Gregory* and *Wendt* are most applicable to the facts of this case. In *Continental Cas. Co. v. Grossmann*, the Appellate Court of Illinois found that three claims of legal malpractice against a single attorney where plaintiffs were likely to recover "on the basis of acts entirely unrelated to the grounds on which the others are able to recover." 271 Ill.App.3d 206, 211, 648 N.E.2d 175, 179, 207 Ill.Dec. 719 (1995). That is not the case here, as the alleged wrongful acts are closely interrelated.

In sum, the allegations in the Underlying Actions are sufficiently related such that they should be considered a single claim for purposes of the per-claim limit contained in Liberty's insurance policy.

## B. Exhaustion of Per–Claim Limitation

It is undisputed that the relevant per-claim limitation from the 2010–2011 Policy is $1,250,000. (SGDMF ¶¶ 5, 10.) Relevant "claim expenses" which count against this limit include "reasonable and necessary fees charged by any lawyer designated by us" and "all reasonable and necessary fees and expenses charged by any lawyer selected by you as independent counsel." (*Id.* ¶ 8.) Defendants have at least raised a triable issue as to whether all fees and costs incurred by Lewis Brisbois were "reasonable and necessary," in that there is a genuine dispute as to whether all such fees and costs were incurred for the benefit of Defendants. Triable issues therefore remain as to whether the per-claim limit has been exhausted.

## V.

## CONCLUSION

In light of the foregoing, Plaintiff's motion for summary judgment is **GRANTED** as to whether the Underlying Actions should be considered a single claim for purposes of the per-claim limit and **DENIED** as to whether the per-claim limit has been exhausted.

**IT IS SO ORDERED.**